GEER, Judge.
 

 *413
 
 Defendant Michael Antonio Bullock was indicted for trafficking in heroin by possession, trafficking in heroin by transportation, and possession with the intent to sell or deliver a Schedule I controlled substance (heroin). Following the denial of defendant's motion to suppress evidence obtained by law enforcement as a result of a search of his vehicle following a traffic stop, defendant pled guilty to the charged offenses. On appeal, defendant argues that the trial court erred in denying his motion to suppress because its findings of fact establish that the officer unlawfully extended the stop, making the subsequent search unlawful. In light of the United States Supreme Court's decision in
 
 Rodriguez v. United States,
 
 --- U.S. ----,
 
 135 S.Ct. 1609
 
 ,
 
 191 L.Ed.2d 492
 
 (2015), we agree and hold, based on the trial court's findings of fact, that the officer unlawfully extended the stop and that defendant's consent to the search did not, therefore, justify the search. Accordingly, we reverse.
 

 Facts
 

 The State presented evidence at the motion to suppress hearing that tended to show the following facts. On 27 November 2012, defendant was traveling south on I85 through Durham. Officer John McDonough of the Durham Police Department was stationary on the side of the interstate when defendant drove past him in the far left lane in a white Chrysler, traveling approximately 70 mph in a 60 mph zone. Officer McDonough observed defendant change lanes to the
 
 *748
 
 middle lane "even though there was no car in front of him."
 

 Officer McDonough began following defendant and paced him for about a mile, as defendant continued to maintain a speed of 70 mph, although the speed limit increased to 65 mph. Officer McDonough, while following defendant in a marked patrol car, observed defendant apply the brakes twice and cross over the white shoulder line. He also observed defendant following a truck too closely, coming within approximately one and a half car lengths of it.
 

 Officer McDonough initiated a traffic stop and approached defendant's car from the passenger side. Officer McDonough asked how defendant was doing and for his driver's license and registration. Defendant already had his driver's license out when Officer McDonough approached and his hand was trembling a little. Officer McDonough
 
 *414
 
 observed two cell phones in the center console of defendant's vehicle. Officer McDonough understood defendant as saying that he was going to Century Oaks Drive to meet a girl, but that he had missed his exit.
 

 Officer McDonough asked defendant for the rental agreement for the vehicle once defendant indicated that the car was a rental. The rental agreement specified that the car was rented by an "Alicia Bullock," and "it looked like [defendant] had written his name in at the date part down where the renter signed her name." However, the only authorized user on the rental agreement was Alicia Bullock.
 

 Officer McDonough asked defendant to step back to his patrol car while he ran defendant's driver's license. He shook hands with defendant and told him that he would give him a warning for the traffic violation. He then asked if he could briefly search defendant for weapons before he got into his patrol car. Defendant agreed and lifted his arms up in the air-Officer McDonough found only cash on him. Defendant later stated that the cash totaled about $372.00. Defendant told Officer McDonough that he was about to go shopping.
 

 While defendant was seated in his patrol car, Officer McDonough ran defendant's North Carolina driver's license through his mobile computer. Officer McDonough's K-9 was located in the back of his police car. Defendant claimed that he had just moved down from Washington, but Officer McDonough learned by running his license that the license was issued back in 2000 and that defendant had been arrested in North Carolina in 2001. Defendant later admitted he had been in the area for a while and claimed he was going to meet a girl he met on Facebook for the first time. However, defendant also mentioned that the same woman would sometimes come up to Henderson to meet him. In addition, when Officer McDonough misidentified the street that defendant had claimed he was traveling to, defendant did not correct him.
 

 Officer McDonough thought defendant looked nervous while he was questioning him in the police car. He noted that defendant was "breathing in and out in his stomach" and was not making much eye contact. Officer McDonough then asked defendant if there were any weapons or drugs in the car and if he could search the vehicle. Defendant gave consent for Officer McDonough to search the car, but not his personal belongings in the car. Defendant clarified that his personal belongings included a bag, some clothes, and some condoms. Officer McDonough called for a backup officer and explained to defendant that he could not conduct a search of a car without a backup officer present. Officer McDonough testified that it took Officer Green around three to
 
 *415
 
 five minutes to arrive, although the surveillance tape indicates closer to 10 minutes elapsed.
 

 While they were waiting for Officer Green, defendant asked what they were waiting for, and Officer McDonough explained that he could get in trouble if he searched the car without another officer present. Defendant asked Officer McDonough what would happen if he did not consent to a search of the car, and Officer McDonough stated that he would then deploy his K-9 dog to search the car. At that time, defendant and Officer McDonough spoke some more about the girl defendant was going to see and other matters unrelated to the traffic stop. Defendant
 
 *749
 
 then asked again, "What are we waiting for now?" He also expressed concern to Officer McDonough that he was "going to make me miss this."
 

 Once Officer Green arrived, Officer McDonough began searching the front passenger area of the car. Officer McDonough felt that the car was still "kind of outside the shoulder" so he moved it further off to the side of the road. Officer McDonough rolled down the window of his patrol car in case defendant revoked consent to search the car, but other than limiting the search to not including the bags, defendant never revoked his consent to search his car. Officer McDonough got to the trunk and then defendant yelled out, "it's not my bag" and "those are not my hoodies...." Defendant explained that it was his sister's bag and that he couldn't give Officer McDonough permission to search her bag.
 

 Officer McDonough had Officer Green remove the bag and put it on the grass. He then got his K-9 dog out of the car. The K-9 went around the car and did not alert to any drugs being in the car. Officer McDonough then had his K-9 sniff the bag on the side of the road, and the dog "immediately put his nose on the bag and came to a sit"-the behavior he exhibits when there is an odor of narcotics. According to Officer McDonough, his K-9 dog has never given a false alert. Officer Green opened the bag and found 100 bindles of heroin in it.
 

 Defendant was indicted on 17 December 2012 by a grand jury for trafficking in heroin by possession, trafficking in heroin by transportation, and possession with the intent to sell or deliver a Schedule I controlled substance. Defendant filed a motion to suppress on 2 July 2014, arguing that the trial court should suppress all of the evidence obtained as a result of the search of the vehicle defendant was driving. A suppression hearing was held on 30 July 2014, and on 4 August 2014, the trial court entered an order denying defendant's motion.
 

 In its order, the trial court made the following findings of fact. Officer McDonough initiated a traffic stop after observing defendant "traveling
 
 *416
 
 70 miles per hour in a 60 mile per hour zone in the far left travel lane." In addition, Officer McDonough observed defendant "come within approximately one and a half car lengths of a silver Ford pickup truck." The trial court noted that Officer McDonough requested defendant's license and registration and that "Defendant's hand was trembling when handing his license over to [Officer] McDonough." Further, the trial court found that defendant was the sole occupant and driver of the car and he "was not listed as an authorized driver" on the rental agreement.
 

 The trial court also found "[t]hat [Officer] McDonough observed that defendant had two cellular phones inside the Chrysler[.]" The trial court found that Officer McDonough "asked defendant where he was traveling" and that "Defendant responded he was going to his girlfriend's house on Century Oaks Drive in Durham and he just missed his exit." The court also found that defendant claimed he just moved from Washington, D.C. to Henderson, North Carolina and indicated that he was using the GPS on his cellphone in order to get to his destination.
 

 In addition, the trial court found:
 

 That [Officer] McDonough requested defendant to exit the Chrysler and have a seat in McDonough's patrol vehicle in order to check defendant's driver's license. Before defendant sat in the passenger seat of the patrol vehicle, [Officer] McDonough met defendant at the rear of the Chrysler, shook defendant's hand, told him he was going to give him a warning for the traffic violations, and briefly check him for weapons. While checking for weapons, [Officer] McDonough observed a small bundle of United States currency totaling $372.00 in defendant's right side pants pocket. Defendant stated he was about to go shopping.
 

 Next, the trial court found that Officer McDonough told defendant he was receiving a warning ticket and that the reason Officer McDonough did so was "to calm [him] down to be able to gauge nervousness not caused by general fear of getting a ticket." The court also noted that Officer McDonough claimed he asked defendant to sit next to him
 
 *750
 
 in his patrol vehicle "to observe defendant when defendant answer[ed] his questions."
 

 The court further found "[t]hat information came back to [Officer] McDonough from the various law enforcement databases that defendant was issued a North Carolina driver's license in 2000 and had a criminal history in North Carolina that began in 2001." Additionally, the court found that Officer McDonough requested that another officer check in
 
 *417
 
 with him so that two officers would be present and able to search the Chrysler. The court also noted that when Officer McDonough questioned defendant about certain items, such as " whether there were any guns in the vehicle, or a dead body in the trunk, defendant was able to make eye contact with [Officer] McDonough while answering the question." When asked about his girlfriend or where he was traveling, however "defendant would not make eye contact and instead looked out the window and away from [Officer] McDonough." Further, "defendant's breathing was elevated and his stomach was rising and falling rapidly."
 

 The trial court then described what happened after Officer McDonough asked defendant if he could search his vehicle, finding "[t]hat [Officer] McDonough asked defendant if he had a problem with him searching the vehicle" and that defendant responded " 'yeah, I don't want you to go in my stuff.' " But, defendant said Officer McDonough could check the car if he wanted. The court indicated "[t]hat at no time did defendant state that he changed his mind and that he did not want [Officer] McDonough to search the Chrysler." Finally, the court found, in Finding of Fact No. 18, that 1,500 bindles of heroin were found in defendant's bag.
 

 Ultimately, the trial court concluded that Officer McDonough had reasonable, articulable suspicion to conduct the traffic stop because defendant was speeding and following another vehicle too closely. Additionally, the court concluded:
 

 That [Officer] McDonough had reasonable, articulable suspicion to extend the traffic stop based on his observations that: defendant was driving on an interstate where illegal drugs are transported; defendant was operating a rental vehicle which he was not authorized to drive; defendant possessed two cellphones and a small bundle of United States currency; defendant was obviously nervous, deceptive, and evasive as noted in his trembling hands, elevated breathing, and lack of eye contact; and defendant made multiple inconsistent statements regarding his destination, who he was going to meet, and how long he had lived in North Carolina.
 

 After the trial court denied defendant's motion to suppress, he pled guilty to the charged offenses, and the trial court sentenced him to a term of 225 to 279 months imprisonment. Defendant timely appealed to this Court.
 

 *418
 

 Discussion
 

 On appeal, defendant argues that the trial court erred in denying his motion to suppress because the officer unlawfully extended the traffic stop, making the subsequent search unlawful. In reviewing a trial court's ruling on a motion to suppress, this Court "determine[s] only whether the trial court's findings of fact are supported by competent evidence, and whether these findings of fact support the court's conclusions of law."
 
 State v. Pulliam,
 

 139 N.C.App. 437
 
 , 439-40,
 
 533 S.E.2d 280
 
 , 282 (2000). Conclusions of law are, however, reviewable de novo.
 
 State v. Kincaid,
 

 147 N.C.App. 94
 
 , 97,
 
 555 S.E.2d 294
 
 , 297 (2001).
 

 This appeal is controlled by
 
 Rodriguez.
 
 In addressing the reasonableness of the duration of a traffic stop, the Supreme Court explained:
 

 A seizure for a traffic violation justifies a police investigation of that violation. A relatively brief encounter, a routine traffic stop is more analogous to a so-called
 
 Terry
 
 stop than to a formal arrest. Like a
 
 Terry
 
 stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission-to address the traffic violation that warranted the stop, and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction
 
 *751
 
 are-or reasonably should have been-completed.
 

 Our decisions in [
 
 Illinois v.] Caballes
 
 [,
 
 543 U.S. 405
 
 ,
 
 125 S.Ct. 834
 
 ,
 
 160 L.Ed.2d 842
 
 (2005) ] and [
 
 Arizona v.] Johnson
 
 [,
 
 555 U.S. 323
 
 ,
 
 129 S.Ct. 781
 
 ,
 
 172 L.Ed.2d 694
 
 (2009) ] heed these constraints. In both cases, we concluded that the
 
 Fourth Amendment
 
 tolerated certain unrelated investigations that did not lengthen the roadside detention. In
 
 Caballes,
 
 however, we cautioned that a traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket. And we repeated that admonition in
 
 Johnson:
 
 The seizure remains lawful only so long as unrelated inquiries do not measurably extend the duration of the stop. An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop.
 
 But ... he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.
 

 *419
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1614-15
 
 ,
 
 191 L.Ed.2d at 498-99
 
 (second emphasis added) (internal citations, quotation marks, brackets, and ellipses omitted).
 

 Before the U.S. Supreme Court's
 
 Rodriguez
 
 decision, this Court had recognized essentially the same principles. In
 
 State v. Myles,
 

 188 N.C.App. 42
 
 , 45,
 
 654 S.E.2d 752
 
 , 754 (quoting
 
 State v. Falana,
 

 129 N.C.App. 813
 
 , 816,
 
 501 S.E.2d 358
 
 , 360 (1998) ),
 
 aff'd per curiam,
 

 362 N.C. 344
 
 ,
 
 661 S.E.2d 732
 
 (2008), this Court explained that " '[o]nce the original purpose of the stop has been addressed, there must be grounds which provide a reasonable and articulable suspicion in order to justify further delay.' " "To determine whether the officer had reasonable suspicion, it is necessary to look at the totality of the circumstances."
 

 Id.
 

 The Court emphasized that "in order to justify [the officer's] further detention of defendant, [the officer] must have had defendant's consent or 'grounds which provide a reasonable and articulable suspicion in order to justify further delay'
 
 before
 
 he questioned defendant."
 

 Id.,
 

 654 S.E.2d at 755
 
 (quoting
 
 Falana,
 

 129 N.C.App. at 816
 
 ,
 
 501 S.E.2d at
 
 360 ).
 

 Applying
 
 Rodriguez
 
 and
 
 Myles
 
 to this case, the mission of the stop was to issue a traffic infraction warning ticket to defendant for speeding and following a truck too closely. Officer McDonough's stop of defendant could, therefore, last only as long as necessary to complete that mission and certain permissible unrelated "checks," including checking defendant's driver's license, determining whether there were outstanding warrants against defendant, and inspecting the automobile's registration and proof of insurance.
 
 Rodriguez,
 
 --- U.S. at ----,
 
 135 S.Ct. at 1615
 
 ,
 
 191 L.Ed.2d at 499
 
 .
 

 Officer McDonough completed the mission of the traffic stop when he told defendant that he was giving defendant a warning for the traffic violations as they were standing at the rear of defendant's car. With respect to the permissible checks, Officer McDonough checked the car rental agreement-the equivalent of inspecting a car's registration and proof of insurance-before he asked defendant to exit his car. Officer McDonough was still permitted to check defendant's license and check for outstanding warrants. But, he was not allowed to "do so in a way that prolong[ed] the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1615
 
 ,
 
 191 L.Ed.2d at 499
 
 .
 

 Rather than taking the license back to his patrol car and running the checks, Officer McDonough required defendant to exit his car, subjected him to a pat down search, and had him sit in the patrol car while
 
 *420
 
 the officer ran his checks. The trial court's findings of fact set out the reason Officer McDonough proceeded in this manner. He told defendant that he was giving him just a warning so he could "attribute nervousness to something other than general anxiety from a routine traffic stop." In addition, the trial court found that Officer "McDonough [had] defendant sit in the passenger seat next to him to observe defendant when defendant answer[ed] his questions." Then, apart from just checking defendant's license and checking for warrants, Officer McDonough ran "defendant's name through various law enforcement databases" while he questioned
 
 *752
 
 defendant at length about subjects unrelated to the traffic stop's mission.
 

 Under existing case law, an officer may, during a traffic stop, lawfully ask the driver to exit the vehicle.
 
 See, e.g.,
 

 State v. McRae,
 

 154 N.C.App. 624
 
 , 629,
 
 573 S.E.2d 214
 
 , 218 (2002) ("When an officer has lawfully detained a vehicle based on probable cause to believe that a traffic law has been violated, he may order the driver to exit the vehicle."). In
 
 Pennsylvania v. Mimms,
 

 434 U.S. 106
 
 , 111,
 
 98 S.Ct. 330
 
 , 333,
 
 54 L.Ed.2d 331
 
 , 337 (1977), the United States Supreme Court found that the "additional intrusion" into the personal liberty of the driver by the officer asking him to step out of the car was, at most, "
 
 de minimis.
 
 " Although "prior to
 
 Rodriguez,
 
 many jurisdictions-including North Carolina-applied a
 
 de minimis
 
 rule, ... the holdings in these cases to the extent that they apply the
 
 de minimis
 
 rule have been overruled by
 
 Rodriguez.
 
 "
 
 State v. Warren,
 
 ---N.C.App. ----, ----,
 
 775 S.E.2d 362
 
 , 365 (2015),
 
 aff'd per curiam,
 
 - -- N.C. ----,
 
 782 S.E.2d 509
 
 (2016). Thus, under
 
 Rodriguez,
 
 even a de minimis extension is too long if it prolongs the stop beyond the time necessary to complete the mission. - -- U.S. at ----,
 
 135 S.Ct. at 1616
 
 ,
 
 191 L.Ed.2d at 500-01
 
 .
 

 The
 
 Rodriguez
 
 Court considered
 
 Mimms
 
 and made comparisons to a dog sniff, noting that while ordering an individual to exit a car can be justified as being for officer safety, a dog sniff could not be justified on the same basis.
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1616
 
 ,
 
 191 L.Ed.2d at 500
 
 . Even so, the Court noted that the "critical question ... is not whether the dog sniff occurs before or after the officer issues a ticket, ... but whether conducting the sniff 'prolongs'-i.e., adds time to-'the stop[.]' "
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1616
 
 ,
 
 191 L.Ed.2d at 501
 
 . Moreover, the Court focused on whether the imposition or interest "stems from the mission of the stop itself[,]" noting: "On-scene investigation into other crimes ... detours from that mission. So too do safety precautions taken in order to facilitate such detours."
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1616
 
 ,
 
 191 L.Ed.2d at 500
 
 (internal citations omitted).
 

 *421
 
 Even assuming Officer McDonough had a right to ask defendant to exit the vehicle while he ran defendant's license, his actions that followed certainly extended the stop beyond what was necessary to complete the mission. The issue is not whether Officer McDonough could lawfully request defendant to exit the vehicle, but rather whether he unlawfully extended and prolonged the traffic stop by frisking defendant and then requiring defendant to sit in the patrol car while he was questioned. To resolve that issue, we follow
 
 Rodriguez
 
 and focus again on the overall mission of the stop. We hold, based on the trial court's findings of fact, that Officer McDonough unlawfully prolonged the detention by causing defendant to be subjected to a frisk, sit in the officer's patrol car, and answer questions while the officer searched law enforcement databases for reasons unrelated to the mission of the stop and for reasons exceeding the routine checks authorized by
 
 Rodriguez.
 

 With respect to Officer McDonough's decision, as the trial court found, to "briefly check [defendant] for weapons," it is well established that "[d]uring a lawful stop, 'an officer may conduct a pat down search, for the purpose of determining whether the person is carrying a weapon,
 
 when the officer is justified in believing that the individual is armed and presently dangerous.
 
 ' "
 
 State v. Johnson,
 
 --- N.C.App. ----,
 
 783 S.E.2d 753
 
 , 764 (2016) (quoting
 
 State v. Sanders,
 

 112 N.C.App. 477
 
 , 480,
 
 435 S.E.2d 842
 
 , 844 (1993) ) (emphasis added). Here, however, the trial court made no findings suggesting that Officer McDonough was justified in believing that defendant might be armed and presently dangerous. Thus, Officer McDonough's frisk of defendant for weapons, without reasonable suspicion that he was armed and dangerous, unlawfully extended the stop.
 

 The dissent argues that defendant consented to the pat down search. We need not decide, however, whether defendant consented, because the moment Officer McDonough asked if he could search defendant's person, without reasonable suspicion that defendant was armed and dangerous, he unlawfully prolonged the stop. Under
 
 Rodriguez,
 
 other than running permissive checks, any additional
 
 *753
 
 amount of time Officer McDonough took that was unrelated to the mission of the stop unlawfully prolonged it.
 

 Officer McDonough then extended the stop further when he had defendant get into his patrol vehicle and ran defendant's name through numerous databases while being questioned, as this went beyond an authorized, routine check of a driver's license or for warrants. The only basis found by the trial court for Officer McDonough's decision to
 
 *422
 
 have defendant get into his patrol vehicle was so that he could "observe defendant when defendant answer [ed] his questions." In other words, the officer was prolonging the detention to conduct a check unrelated to the traffic stop. Under
 
 Rodriguez,
 
 he could "not do so in a way that prolong[ed] the stop absent the reasonable suspicion ordinarily demanded to justify detaining an individual." - -- U.S. at ----,
 
 135 S.Ct. at 1615
 
 ,
 
 191 L.Ed.2d at 499
 
 . Consequently, given the trial court's finding of fact and
 
 Rodriguez,
 
 Officer McDonough was required to have reasonable suspicion before asking defendant to go to his patrol vehicle to be questioned.
 

 By requiring defendant to submit to a pat-down search and questioning in the patrol car unrelated to the purpose of the traffic stop, the officer prolonged the traffic stop beyond the time necessary to complete the stop's mission and the routine checks authorized by
 
 Rodriguez.
 
 ,
 
 State v. Castillo,
 
 --- N.C.App. ----,
 
 787 S.E.2d 48
 
 ,
 
 2016 WL 1742867
 
 (May 3, 2016) (No. COA15-855) under
 
 Rodriguez,
 
 investigation unrelated to the mission of the traffic stop "is not necessarily prohibited, but extending the stop to conduct such an investigation is prohibited."
 

 The question is, then, did Officer McDonough have reasonable articulable suspicion that criminal activity was occurring prior to the extended detention?
 
 See
 

 Rodriguez,
 
 --- U.S. at ----,
 
 135 S.Ct. at 1615
 
 ,
 
 191 L.Ed.2d at 499
 
 (holding that while officer may engage in checks unrelated to traffic stop, "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual");
 
 Castillo,
 
 --- N.C.App. at ----,
 
 787 S.E.2d at 55
 
 ,
 
 2016 WL 1742867
 
 , at *8 (in determining whether officer had reasonable suspicion to extend detention, Court looked at "factors ... known to [the officer] while he stood on the roadside before defendant joined him in the patrol vehicle").
 

 " '[A] trial court's conclusions of law regarding whether the officer had reasonable suspicion [or probable cause] to detain a defendant is reviewable
 
 de novo.
 
 ' "
 
 State v. Hudgins,
 

 195 N.C.App. 430
 
 , 432,
 
 672 S.E.2d 717
 
 , 718 (2009) (quoting
 
 State v. Wilson,
 

 155 N.C.App. 89
 
 , 93-94,
 
 574 S.E.2d 93
 
 , 97 (2002) ). Thus, we review de novo the trial court's conclusion in this case that Officer McDonough had reasonable, articulable suspicion to extend the defendant's detention.
 

 Based on the trial court's findings, the only information that Officer McDonough had to raise suspicion prior to the officer subjecting defendant to the
 
 Terry
 
 pat down was: (1) defendant was driving on I-85, an
 
 *423
 
 interstate used for the transport of drugs; (2) defendant was operating a rental vehicle that he was not authorized to drive; (3) defendant possessed two cellphones; (4) defendant's hand trembled when he handed the officer his license; (5) defendant told the officer he was going to Century Oaks Drive, but had missed his exit, when in fact he had passed three major exits that would have allowed defendant to reach his claimed destination; and (6) defendant, when first observed, was traveling in the far left hand lane and did not appear to be intending to exit off of I-85. However, these circumstances, considered together, give rise to only a hunch and not the particularized suspicion necessary to justify detaining defendant.
 
 See
 

 State v. Fields,
 

 195 N.C.App. 740
 
 , 744,
 
 673 S.E.2d 765
 
 , 767-68 (2009) (holding that "police officer must develop more than an unparticularized suspicion or hunch before he or she is justified in conducting an investigatory stop" (internal quotation marks omitted)).
 

 Officer McDonough's testimony and the trial court's findings that the officer told defendant he would get a warning ticket so that the officer would then be able to distinguish between nervousness over receiving a ticket and nervousness for other reasons shows that the nervousness before the warning
 
 *754
 
 -the hand tremble-was not enough to raise a suspicion.
 
 See
 

 Myles,
 

 188 N.C.App. at 49
 
 ,
 
 654 S.E.2d at 757
 
 (noting that the Supreme Court has held "that a defendant's extreme nervousness may be taken into account in determining whether reasonable suspicion exists"). Mere trembling of a hand when handing over a driver's license cannot be considered "extreme nervousness,"
 

 id.,
 

 and, therefore, this tremble is not relevant to the totality of the circumstances.
 
 See also
 

 State v. Pearson,
 

 348 N.C. 272
 
 , 276,
 
 498 S.E.2d 599
 
 , 601 (1998) (noting that "[t]he nervousness of the defendant is not significant" because "[m]any people become nervous when stopped by a state trooper").
 

 The other circumstances, without more, describe innocent behavior that even collectively does not raise a particularized suspicion of criminal activity.
 
 See
 

 Myles,
 

 188 N.C.App. at 47, 50, 51
 
 ,
 
 654 S.E.2d at 756, 758
 
 (holding no reasonable suspicion existed to extend traffic stop when rental car occupants' stories did not conflict, rental car was rented by passenger rather than driver, there was no odor of alcohol although car had weaved in lane, officer found no contraband or weapons upon frisking driver, and driver's license was valid, although driver's "heart was beating unusually fast" and rental car was one day overdue).
 

 Indeed, the trial court's finding of reasonable suspicion depended substantially on circumstances that arose after Officer McDonough had extended the stop, including the discovery that defendant had $372.00 in cash, defendant's elevated breathing and lack of eye contact, and his
 
 *424
 
 multiple inconsistent statements regarding his destination, who he was going to meet, and how long he had lived in North Carolina. Although both the trial court and Officer McDonough, in his testimony, relied substantially on inconsistencies in defendant's story that developed while he was questioned in the officer's patrol car, defendant's initial explanation for missing his exit-he was talking on his cell phone-presented no inconsistent statement and was not implausible without consideration of the further questioning. The State has pointed to no authority that suggests that in the absence of the post-extension circumstances, the circumstances present in this case prior to the frisk were sufficient to give rise to reasonable suspicion.
 

 However, we find the Fourth Circuit's decision in
 
 United States v. Digiovanni,
 

 650 F.3d 498
 
 (4th Cir.2011), persuasive. In
 
 Digiovanni,
 
 the Fourth Circuit acknowledged that "[t]he Supreme Court has recognized that factors consistent with innocent travel can, when taken together, give rise to reasonable suspicion."
 

 Id.
 

 at 511
 
 . On the other hand, "[t]he articulated innocent factors collectively must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied."
 

 Id.
 

 (internal quotation marks omitted).
 

 The officer in
 
 Digiovanni
 
 claimed to have developed reasonable suspicion to prolong the traffic stop due to 10 factors, including that: (1) the car was a rental car; (2) the car was coming from a known drug-supply state (Florida); (3) the car was travelling on I-95, a known drug corridor; (4) the car was clean; (5) two shirts hanging in the back; (6) toiletry bag in backseat; (7) the defendant's hands trembled; (8) the defendant's response to questions; (9) the defendant's travel itinerary; and (10) the defendant said, " 'oh boy' " when the officer asked if he had any luggage in the car and if everything in the car belonged to him.
 

 Id.
 

 at 512
 
 . The Fourth Circuit dismissed the officer's reliance on the clean car, the two shirts, and the toiletry bag as absurd and accepted the district court's finding that the defendant's " 'oh boy' " statement referred to the heat.
 

 Id.
 

 Turning to the remaining circumstances, the Fourth Circuit reasoned:
 

 With regard to the car rental, the traveling on I-95, and the traveling from Florida factors, there is little doubt that these facts enter the reasonable suspicion calculus. With regard to [the defendant's] travel itinerary, [the officer] certainly was entitled to rely, to some degree, on its unusual nature in determining whether criminal activity was afoot.
 

 *425
 
 Nevertheless, we agree with the district court that reasonable suspicion was not present to turn this routine traffic stop into a drug investigation. The articulated
 
 *755
 
 facts, in their totality, simply do not eliminate a substantial portion of innocent travelers.... It is true that [the defendant's] travel itinerary is unusual-not many people are flying from Boston to Miami for the weekend, renting a car for the return trip to Boston, traveling part of the way on the Auto Train, and stopping in New York to pick up some paintings. The problem for the government is that this unusual travel itinerary is not keyed to other compelling suspicious behavior. In this case, other than [the defendant's] unusual travel itinerary, there is nothing compellingly suspicious about the case. There is no evidence of flight, suspicious or furtive movements, or suspicious odors, such as the smell of air fresheners, alcohol, or drugs. All the government can link to the unusual travel itinerary are the facts that [the defendant] rented a car from a source state, was stopped on I-95, and was initially nervous. Such facts, without more, simply do not eliminate a substantial portion of innocent travelers.
 

 Id.
 

 at 512-13
 
 (internal citations omitted).
 

 We find
 
 Digiovanni
 
 remarkably similar to this case. As in
 
 Digiovanni,
 
 defendant was driving a rental car, was stopped on I-85, and his hand trembled. The issue with defendant's travel itinerary-missing multiple exits for his supposed destination while talking on the phone-was less unusual than that in
 
 Digiovanni.
 
 In addition, defendant had two cell phones, but, just as in
 
 Digiovanni,
 
 there was no compelling suspicious behavior. These circumstances considered together, "without more, simply do not eliminate a substantial portion of innocent travelers[,]"
 

 id.
 

 at 513
 
 , and, therefore, do not give rise to reasonable, articulable suspicion.
 
 See also
 

 United States v. Williams,
 

 808 F.3d 238
 
 , 246 (4th Cir.2015) (holding that "the relevant facts articulated by the officers and found by the trial court, after an appropriate hearing, must in their totality serve to eliminate a substantial portion of innocent travelers" (internal quotation marks omitted)).
 

 In this Court's decision in
 
 Castillo,
 
 by contrast, the Court found that the trial court properly determined that an officer had reasonable suspicion to extend a traffic stop based on "defendant's bizarre travel plans, his extreme nervousness, the use of masking odors, the smell of marijuana on his person, and the third-party registration of the vehicle...."
 

 *426
 
 - -- N.C.App. at ----,
 
 787 S.E.2d at 55
 
 ,
 
 2016 WL 1742867
 
 , at *8. The evidence in this case does not rise to the same level.
 
 See also
 

 State v. Cottrell,
 

 234 N.C.App. 736
 
 , 745,
 
 760 S.E.2d 274
 
 , 281 (2014) (holding that officer unlawfully extended stop when he based detention on only strong incense-like fragrance and defendant's felony and drug history). Accordingly, we hold that the trial court erred in concluding that Officer McDonough had reasonable articulable suspicion to extend the traffic stop.
 

 However, the trial court also concluded that defendant voluntarily consented to the search of his vehicle. In its order denying defendant's motion to suppress, the trial court concluded "[t]hat defendant gave knowing, willing, and voluntary consent to search the vehicle" and "[t]hat at no point after giving his consent did defendant revoke his consent to search the vehicle." Since we have concluded that Officer McDonough did not have reasonable suspicion to extend the stop, whether defendant may have later consented to the search is irrelevant, as consent obtained during an unlawful extension of a stop is not voluntary.
 
 See
 

 Myles,
 

 188 N.C.App. at 51
 
 ,
 
 654 S.E.2d at 758
 
 ("Since [the officer's] continued detention of defendant was unconstitutional, defendant's consent to the search of his car was involuntary.");
 
 see also
 

 Cottrell,
 

 234 N.C.App. at 747
 
 ,
 
 760 S.E.2d at 282
 
 (holding that because officer unlawfully extended stop, did not give defendant his license back, and continuously questioned defendant, "the trial court correctly found that defendant's detention never became consensual in this case").
 

 Thus, we hold that the trial court's order denying defendant's motion to suppress must be reversed. We, therefore, vacate defendant's guilty plea and remand to the trial court for further proceedings consistent with this opinion. Since we vacate defendant's plea, we do not need to address his additional arguments related to whether he entered into it knowing and voluntarily.
 

 REVERSED.
 

 *756
 
 Judge BRYANT concurs.
 

 Judge McCULLOUGH dissents in a separate opinion.
 

 McCULLOUGH, Judge, dissent.
 

 From the majority's conclusion that Officer John McDonough of the Durham Police Department unnecessarily extended the traffic stop
 
 *427
 
 involving Michael Antonio Bullock ("defendant"), I respectfully dissent. The facts are fully set forth in the majority opinion and will not be repeated unless necessary to demonstrate the reasoning of this dissent. Needless to say, traffic stops are some of the most-litigated police-citizen encounters and have long been recognized as fraught with danger to officers. Thus, certain rules have evolved over the years to allow traffic law enforcement to be conducted safely and efficiently. We grapple with those rules in this opinion.
 

 In the case at bar, the majority concludes that the traffic stop in question was extended when the officer caused defendant to exit his car, be subjected to a frisk, and sit in the patrol car while answering questions while the officer ran various data bases, thereby violating the traffic stop rules recently set forth by the United States Supreme Court in
 
 Rodriguez v. U.S.,
 
 --- U.S. ----,
 
 135 S.Ct. 1609
 
 ,
 
 191 L.Ed.2d 492
 
 (2015). I disagree and believe his actions to be reasonable, well within the parameters allowed by
 
 Rodriguez.
 
 It is conceded by defendant that the initial traffic stop was based on reasonable suspicion, thus we focus on what Officer McDonough's actions were from the time he approached the defendant's vehicle until consent was given to search that vehicle.
 

 As the majority opinion notes, before leaving defendant's vehicle, the officer was aware that the car was on I-85, but being a local vehicle and licensee, this factor is not significant; defendant had two cell phones; was not the authorized user of the rental car; defendant told the officer he was going to Century Oaks Drive which was several exits previous to the one where he was stopped; when stopped defendant was accelerating in the far left lane and thus did not appear to be seeking an exit. Defendant had also told the officer he had been on his cell phone as an excuse for how he missed the proper exit. The majority concludes that based on these facts the officer did not have reasonable suspicion to extend the stop. I agree with that conclusion. Where the majority and I disagree is whether a stop is unnecessarily extended by having the motorist accompany the officer to the patrol car while a citation is prepared and data bases are checked.
 

 Police questioning during a traffic stop is not subject to the strictures of
 
 Miranda,
 

 Berkemer v. McCarty,
 

 468 U.S. 420
 
 , 435-42,
 
 104 S.Ct. 3138
 
 , 3147-52,
 
 82 L.Ed.2d 317
 
 , 331-36 (1984), and mere police questioning does not constitute a seizure.
 
 Florida v. Bostick,
 

 501 U.S. 429
 
 , 434,
 
 111 S.Ct. 2382
 
 , 2386,
 
 115 L.Ed.2d 389
 
 , 398 (1991). As the majority notes, under existing case law, a driver may be ordered to exit the vehicle.
 
 State v. McRae,
 

 154 N.C.App. 624
 
 , 629,
 
 573 S.E.2d 214
 
 , 218 (2002). Such orders by police without any reasonable suspicion,
 
 *428
 
 but based on officer safety have long been permitted.
 
 Pennsylvania v. Mimms,
 

 434 U.S. 106
 
 , 111,
 
 98 S.Ct. 330
 
 , 333-34,
 
 54 L.Ed.2d 331
 
 , 337 (1977). The ultimate question here is can the officer, as a matter of routine, have the motorist sit in the police vehicle while the officer prepares his citation and runs any data base checks.
 

 In
 
 Rodriguez,
 
 the United States Supreme Court held that a traffic stop cannot be unnecessarily extended while an unrelated investigation is conducted, absent reasonable suspicion. - -- U.S. at ----,
 
 135 S.Ct. at 1612
 
 ,
 
 191 L.Ed.2d at 496
 
 . Even a
 
 de minimis
 
 delay is impermissible. The holding in
 
 Rodriguez
 
 is actually unremarkable and is essentially what has been the rule for quite a while in North Carolina.
 
 See
 

 State v. Myles,
 

 188 N.C.App. 42
 
 , 45,
 
 654 S.E.2d 752
 
 , 754,
 
 aff'd per curiam,
 

 362 N.C. 344
 
 ,
 
 661 S.E.2d 732
 
 (2008).
 

 The majority opinion relies on two main reasons it believes the traffic stop was unnecessarily extended. First, the majority concludes that the pat down of defendant prior to directing him to sit in the patrol car extended the stop as the officer did not have any reasonable suspicion that defendant was armed and he testified he did not feel threatened.
 

 *757
 
 I disagree that this pat down search during which a sum of money ($372) was discovered was an unnecessary extension as the pat down was conducted by consent. At the suppression hearing held on 30 July 2014, Officer McDonough testified as follows:
 

 A. Just the two phones, and at that point, I asked him to step back to my car, and we were going to run his driver's license.
 

 Q. Okay. And what happened when you made that request?
 

 A. He agreed and got out. I met him in the back of his car. I shook his hand, gave him a warning for the traffic violation, and then I asked him if I could search him before he got into my patrol car.
 

 Q. Okay. And what did he say to you?
 

 A. He said, yes, and he lifted his arms up in the air.
 

 Q. Okay. And then what happened after that?
 

 A. I searched his right pants' pocket that had the currency of different denominations, and he said he was about to go shopping.
 

 *429
 
 Q. Do you know how much money he had in that bundle you were talking about that he was going shopping with?
 

 A. It was-he told me later on in the traffic stop, I think he said $372.
 

 Q. And when he told you he was going shopping, when did he say that to you?
 

 A. Right when I grabbed the money, that he was going shopping.
 

 Q. And what kind of indicator was that to you?
 

 A. Through my experience, a lot of times guys who are involved in activity of transporting or either be a courier or be involved in it will have large sums of money in their pockets.
 

 I do not believe an officer unnecessarily extends a traffic stop by conducting a consensual search prior to running a driving history check or warrants check on a motorist.
 

 The majority opinion quotes from
 
 Rodriguez
 
 emphasizing that a traffic stop may not be unnecessarily extended while an officer conducts an unrelated investigation.
 
 Rodriguez
 
 also noted however that the officer may conduct certain routine actions, stating:
 

 Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. (A "warrant check makes it possible to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses.").
 

 Rodriguez,
 
 --- U.S. at ----,
 
 135 S.Ct. at 1615
 
 ,
 
 191 L.Ed.2d at 499
 
 , (internal citations omitted).
 

 It should also be noted that Officer McDonough's questioning defendant about his travel plans, usually referred to as "coming and going" questions are part and parcel of a traffic stop as the questions and answers given can impact driver fatigue and other traffic related issues.
 
 See
 

 U.S. v. Barahona,
 

 990 F.2d 412
 
 , 416 (8th Cir.1993) ;
 
 Ohio v.
 

 *430
 

 Carlson,
 

 102 Ohio App.3d 585
 
 ,
 
 657 N.E.2d 591
 
 , 599 (1995). In the case at bar the officer was also confronted by an unauthorized operator of a rental vehicle. The use of rental vehicles by unauthorized users was one of the major indicators of unlawful activity that the officer stressed in his suppression hearing testimony. Depending on what his data base checks revealed, Officer McDonough might have an individual who was in violation of several motor vehicle laws, N.C. Gen.Stat. § 14-72.2 (unauthorized use of motor-propelled conveyance) or even N.C. Gen.Stat. § 20-106 (possession of stolen vehicle). In other words, the officer is not obligated to credit the motorist's version of how he came into possession of the vehicle, but is entitled to conduct a short investigation into the circumstances.
 
 See
 

 United States v. Sharpe,
 

 470 U.S. 675
 
 ,
 
 105 S.Ct. 1568
 
 ,
 
 84 L.Ed.2d 605
 
 (1985).
 

 With this background in mind, we must face the issue presented by the majority
 
 *758
 
 opinion, namely whether Officer McDonough had the authority to direct defendant to sit in the patrol car with him as he wrote him a warning ticket and conducted his background checks. For if he had that authority, almost immediately after sitting down in the patrol car defendant provided information that evolved into reasonable suspicion. If the encounter is to be limited to what the officer knew roadside, the majority opinion is correct and the trial court should be reversed. As far as delaying the mission of the traffic stop, directing a motorist to sit in the police vehicle does not in any way delay the traffic stop. The majority recognizes that the traffic stop is not unnecessarily extended while the officer prepares the ticket and runs his data base checks. Directing the motorist to accompany the officer does not create unnecessary delay as the two (motorist and officer) will walk to the police car in the same length of time as if the officer had walked alone.
 

 Whether an officer can direct a motorist to sit in the police vehicle while these actions are taken, is an open question in North Carolina. The courts that have considered this issue view it through the prism of an additional seizure. Many cases, state and federal, have implicitly recognized that officers have the authority to direct a motorist to sit in the police vehicle while the ticketing process is accomplished.
 
 See,
 

 Barahona,
 

 990 F.2d at 414
 
 (in which the officer asked the defendant to exit the car and accompany him to the patrol car). Several federal courts have concluded that an officer needs a reasonable justification, normally a specific, articulable safety concern, before the officer may direct a motorist to sit in the patrol vehicle,
 
 see
 

 U.S. v. Cannon,
 

 29 F.3d 472
 
 , 476-77 (9th Cir.1994),
 
 U.S. v. Ricardo D.,
 

 912 F.2d 337
 
 , 340-41 (9th Cir.1990), while other courts have determined that if an officer's request is merely part of the ticketing procedure, then having the motorist sit in
 
 *431
 
 the police vehicle is within the permissible scope of a
 
 Terry
 
 stop.
 
 See
 

 U.S. v. Rodriguez,
 

 831 F.2d 162
 
 , 166 (7th Cir.1987),
 
 U.S. v. Rivera,
 

 906 F.2d 319
 
 , 322-23 (7th Cir.1990),
 
 U.S. v. Bloomfield,
 

 40 F.3d 910
 
 , 915 (8th Cir.1994) (reasonable investigation includes requesting that the driver sit in the patrol car),
 
 Ohio v.
 

 Lozada,
 

 92 Ohio St.3d 74
 
 ,
 
 748 N.E.2d 520
 
 , 523 (2001). Even those jurisdictions which believe the officer needs some justification to direct a motorist to accompany him or her to the patrol vehicle recognize some exceptions. Here Officer McDonough was faced with an unauthorized user of a rental vehicle. At the moment he directed defendant to proceed to the police vehicle, as stated earlier, he did not know if the data base check might reveal a reported theft. Even verification of defendant's story that he borrowed the car from a relative who was the renter could be facilitated by defendant's presence.
 

 Thus, I maintain that an officer acts within the constitutional parameters of a "
 
 Terry
 
 stop" when he directs a motorist to accompany the officer to the police vehicle during the ticketing process. Based on the line of cases cited previously, it is my position that under either line of cases, Officer McDonough was justified in directing defendant to sit in the patrol car, even if it was only to be of assistance in determining if defendant had permission to use the vehicle from the renter. We know he did not have the owner's permission as he was not on the rental agreement. Upon entering the vehicle, defendant almost immediately provided enough information to provide the officer with enough reasonable suspicion to extend the stop until he received consent to search. It is not contested that consent was given, the only issue concerns whether the stop was unnecessarily extended in violation of
 
 Rodriguez
 
 so that the officer was never in a position to ask for consent.
 

 At the suppression hearing Officer McDonough testified as follows:
 

 A. I told him to have a seat in the patrol car.
 

 Q. And did he comply?
 

 A. Yes, sir.
 

 Q. And when you had him in your patrol vehicle, what happened?
 

 A. At that point, I started-got his license and started running his license and other information in my mobile computer.
 

 Q. Can you walk the Court through when you're running someone's name like how many programs are you running the names through?
 

 *759
 

 *432
 
 A. There's about three databases that I usually use. One is for our police program, CJ Leads, and I use a program called "TLO", also.
 

 Q. What do those programs actually tell you?
 

 A. CJ Leads will give all criminals in North Carolina. Our program will have driver's-had arrested in Durham, and TLO usually helps with people from out-of-state, shows their criminal history from out-of-state.
 

 Q. Do you have an idea how long it takes you to run a CJ Lead or how long it takes to run somebody's license?
 

 A. It takes a little bit because we have to go in and out, log in, run a wire-so it takes a little bit.
 

 Q. You said it takes a little bit, like are you talking seconds, minutes?
 

 A. It takes minutes.
 

 Q. So while you're running his name through various databases, what is happening?
 

 A. Well, I remember when he first got in the car and-where he was going, he said he just moved down here from Washington. So I started running that in CJ Leads and TLO, he said he was from Washington. When I ran his driver's license, it was issued back in 2000, and he had been arrested in North Carolina starting 2001. So he's already been down here 12 years when he said he just moved down here from Washington.
 

 Q. What does that tell you?
 

 A. I just thought I[sic] was strange because you just moved down here from Washington, but you've been here for 12 years. You didn't just move down from Washington. I don't know if he's just trying to throw that out at me, to throw me off or not.
 

 Q. And what happened after you noticed that he had a license since 2000, and you were looking at records, an arrest record that started from 2001, and had indicated to you on November 27th, 2012 that he had just moved from DC?
 

 *433
 
 A. We started having some conversation. He did later say that he's been down here a while, started talking about how he met this girl, he said he met her on Facebook, known her about two weeks, and he said it's the first time he came down here to meet her because she always comes to Henderson. And I think we were discussing his criminal history. He mentioned about the gun, he said he had two occasions where his ex-wife had put the gun in the glove box, and he was driving the car and got arrested for it in Vance County, and I think South Carolina-and he started asking me questions about why I think that happened in Vance County while it was running his information.
 

 Q. So taking a step back, so you are discussing you mention about how he met the girl he was apparently going to see on Century Oaks. Was there anything of note in your discussion about the woman he was apparently going go see?
 

 A. Like I said, he said he just met her on Facebook. He never met her face-to-face, but he confused me when he says, well, she always comes up to Henderson; if he never met her face-to-face, how does she always come to Henderson. And later on in the conversation, he said she's come to Henderson, but he's never met her I believe.
 

 Q. So when you're speaking in regards to the girlfriend, what does that tell you?
 

 A. That tells me that that story is-he's not telling the truth about that story.
 

 After having this conversation and running defendant's driver's license record as
 
 Rodriguez
 
 permits while also checking for warrants, Officer McDonough obtained reasonable suspicion to extend the stop and request consent to search. To summarize, the officer not only had that information he obtained prior to proceeding to the police vehicle, he also knew defendant had a sum of cash ($372), defendant had not just come down from D.C. as claimed initially, but had been here since 2000, thus his story about not being that familiar with the roads is likely to be untrue, and defendant made contradictory statements about the girl he was going to meet. Also, during this dialogue, the officer twice mispronounced the name of the street defendant said he was going to without any
 
 *760
 
 correction being made by defendant. Contradictory statements
 
 *434
 
 regarding one's destination are a strong factor in providing reasonable suspicion.
 
 See
 

 U.S. v. Carpenter,
 

 462 F.3d 981
 
 , 987 (8th Cir.2006). After the conversation, while the data base for defendant's drivers license was checked, the officer had reasonable suspicion to detain defendant and ask for consent to search. I would then affirm the decision of the trial court to deny the motion to suppress.