HUNTER, JR., Robert N., Judge.
*525 David Michael Reed ("Defendant") filed a motion to suppress evidence found during a traffic stop. On 14 July 2015, the trial court entered an order denying Defendant's motion to suppress. On 21 July 2015, Defendant pleaded guilty to trafficking more than 200 grams but less than 400 grams of cocaine by transportation, and trafficking more than 200 grams but less than 400 grams of cocaine by possession. The trial court sentenced Defendant to 70 to 93 months imprisonment and imposed a $100,000.00 fine and $3,494.50 in court costs. On appeal, this Court held the trial court committed reversible error by denying Defendant's motion to suppress.
On 5 October 2016, the State filed a petition for writ of supersedeas and a motion for temporary stay with the Supreme Court of North Carolina. The same day, the Supreme Court allowed the State's motion for temporary stay. On 25 October 2016, the State filed notice of appeal, pursuant to the dissenting opinion. On 2 November 2016, the court allowed Defendant's petition for writ of supersedeas . In an opinion filed 3 November 2017, the court vacated the opinion of this Court and remanded for reconsideration in light of the Supreme Court's recent decision in State v. Bullock , 370 N.C. 256, 805 S.E.2d 671 (2017) (194A16). On remand, after reviewing Bullock and the arguments advanced by the parties, we reverse the decision of the trial court.
I. Factual and Procedural Background
At 8:18 a.m. on 9 September 2014, Defendant drove a rented Nissan Altima faster than the posted sixty-five miles per hour speed limit on Interstate 95 ("I-95") in Johnston County, North Carolina. His fiancée, Usha Peart, rode in the front passenger seat and held a female pit bull in her lap. Trooper John W. Lamm, of the North Carolina State Highway Patrol, was parked in the median of I-95. Trooper Lamm used his radar to determine Defendant was traveling seventy-eight miles per hour, and performed a traffic stop for Defendant's speeding infraction. Trooper Lamm's patrol car had a camera that faced forwards towards the hood of the vehicle, and recorded audio inside and outside of the patrol car.
*247 *526 Defendant pulled over on the right shoulder of I-95, Trooper Lamm pulled behind him, and Trooper Lamm approached the passenger side of the Nissan. Trooper Lamm saw energy drinks, trash, air fresheners, and dog food scattered on the floor of the vehicle. He asked if the dog in Peart's lap was friendly and Defendant and Peart said the dog was friendly.
Trooper Lamm stuck his arm inside the vehicle to pet the dog and asked Defendant for his driver's license and the rental agreement. Defendant gave Trooper Lamm his New York driver's license, a registration card, and an Enterprise rental car agreement. The rental agreement listed Peart as the renter and Defendant as an authorized driver. Trooper Lamm told Defendant "come on back here with me" motioning towards his patrol car.
Defendant exited the Nissan and Trooper Lamm asked if he had any guns or knives on his person. Defendant asked Trooper Lamm why the frisk was necessary, and Trooper Lamm replied, "I'm just going to pat you down for weapons because you're going to have a seat with me in the car." Trooper Lamm found a pocket knife, said it was "no big deal," and put it on the hood of the Nissan.
Trooper Lamm opened the passenger door of his patrol car. His K-9 was in the back seat of the patrol car at that time. Defendant sat in the front passenger seat with the door open and one leg outside of the car. Trooper Lamm told Defendant to close the door. Defendant hesitated and said he was "scared" to close the door; Lamm replied, "Shut the door. I'm not asking you, I'm telling you to shut the door. I mean you're not trapped, the door [is] unlocked. Last time I checked we were the good guys." Defendant said, "I'm not saying you're not," and Trooper Lamm said, "You don't know me, don't judge me." Defendant said he was stopped before in North Carolina, but he was never taken to the front passenger seat of a patrol car during a stop. Following Trooper Lamm's orders, Defendant closed the front passenger door.
Trooper Lamm ran Defendant's New York license through record checks on his mobile computer. While doing so, Trooper Lamm asked Defendant about New York, and "where are y'all heading to?" Defendant said he was visiting family in Fayetteville, North Carolina. Trooper Lamm noted the rental agreement restricted travel to New York, New Jersey, and Connecticut, but told Defendant the matter could likely be resolved with a phone call to the rental company.
Then, Trooper Lamm asked Defendant about his criminal history. Defendant admitted he was arrested for robbery in the past, when he *527 was in the military. Trooper Lamm asked Defendant about his living arrangements with Peart, and whether he or Peart owned the dog in the Nissan. Trooper Lamm noticed the rental agreement was drafted for a Kia Rio not a Nissan Altima. Trooper Lamm exited the patrol car to ask Peart for the correct rental agreement, and told Defendant to "sit tight."
Trooper Lamm approached the front passenger side of the Nissan Altima and asked Peart for the correct rental agreement. He asked about her travel plans with Defendant and the nature of their trip. She said they were visiting family in Fayetteville but might also travel to Tennessee or Georgia. She explained the first rental car they had, the Kia Rio, was struck by another car and the rental company gave them the Nissan Altima as a replacement. She could not find the rental agreement for the Nissan Altima and continued to look for it. Trooper Lamm told Peart he was going to issue Defendant a speeding ticket and the two would "be on [their] way."
Trooper Lamm returned to the patrol car, explained Peart could not locate the correct rental agreement, and continued to question Defendant about the purpose of the trip to Fayetteville. Then, Trooper Lamm called the rental company and the rental company confirmed everything was fine with the Nissan Altima rental, but informed Trooper Lamm that Peart still needed to call the company to correct the restricted travel condition concerning use of the car in New York, New Jersey, and Connecticut. After the call, Trooper Lamm told Defendant his driver's license was okay and he was going to receive *248 a warning ticket for speeding. Trooper Lamm issued a warning ticket, returned all of Defendant's paperwork including his license and asked Defendant if he had any questions.
Then, Trooper Lamm told Defendant he was "completely done with the traffic stop," but wanted to ask Defendant additional questions. Defendant did not make an audible response, but at the suppressing hearing, Trooper Lamm testified Defendant nodded his head. Trooper Lamm did not tell Defendant he was free to leave. At this point, an additional officer, Trooper Ellerbe, was present on the scene. Trooper Ellerbe parked his patrol car behind Trooper Lamm's and left his blue lights on. He stood directly beside the passenger door of Trooper Lamm's vehicle where Defendant sat.
Trooper Lamm asked Defendant if he was carrying a number of controlled substances, firearms, or illegal cigarettes in the Nissan Altima. Defendant responded, "No liquor, no nothing, you can break the car down." Trooper Lamm continued questioning Defendant and said, "I want to search your car, is that okay with you?" Defendant hesitated, *528 mumbled, and told Trooper Lamm to ask Peart. Defendant stated, "I'm just saying, I've got to go to the bathroom, I want to smoke a cigarette, we're real close to getting to the hotel so that we can see our family, like, I don't, I don't see a reason why." Trooper Lamm responded, "[W]ell let me go talk to her then, sit tight," and walked to the front passenger side of the Nissan Altima. By this time, two additional officers were present at the scene.
Trooper Lamm told Peart everything was fine with the rental agreement and asked her the same series of questions he asked Defendant, whether the two were carrying controlled substances, firearms, or illegal cigarettes. Trooper Lamm asked Peart if he could search the car. Peart hesitated, expressed confusion, and stated, "No. There's nothing in my car, I mean...." Trooper Lamm continued to ask for consent, Peart acquiesced and agreed to sign a written consent form. Trooper Lamm searched the Nissan Altima and found cocaine under the back passenger seat.
II. Analysis
Defendant originally argued before this Court the trial court erred in denying his motion to suppress evidence discovered pursuant to an unlawful traffic stop. Specifically, Defendant argued the trial court made findings of fact which were not supported by competent evidence because his "initial investigatory detention was not properly tailored to address a speeding violation." He also contended Trooper Lamm seized him without reasonable suspicion of criminal activity, when the trooper told him to exit his vehicle and sit in the patrol car. Defendant further argued the officer unlawfully seized items from the car during the search, and these items are fruit of the poisonous tree, which must be suppressed. This Court agreed.
Relying on the United States Supreme Court's guidance in Rodriguez v. United States and our prior decision in State v. Bullock we held:
[A]n officer may offend the Fourth Amendment if he unlawfully extends a traffic stop by asking a driver to step out of a vehicle. The same is true of an officer who unlawfully extends a traffic stop by asking a driver to sit in his patrol car, thereby creating the need for a weapons pat down. It is also possible for an officer to unlawfully extend a traffic stop by telling a driver to close the patrol car's front passenger door, while the officer questions the driver about matters unrelated to the traffic stop.
*529 State v. Reed , --- N.C. App. ----, ----, 791 S.E.2d 486, 492 (2016) (citations and footnotes omitted). We determined the trooper's authority to seize Defendant for speeding ended "when tasks tied to the traffic infraction [were]-or reasonably should have been- completed." Id. (quoting Rodriguez v. United States , --- U.S. ----, ----, 135 S.Ct. 1609, 1614, 191 L.Ed.2d 492, 498 (2015) (emphasis added) (citation omitted)). We determined at the very latest, the authority to seize ended when the officer told Defendant he was going to issue a warning ticket, and gave him a copy of the ticket. Id.
We ultimately held Trooper Lamm did not have reasonable suspicion to search the vehicle *249 after the traffic stop concluded, because the evidence the trial court relied upon in support of a finding of reasonable suspicion constituted legal behavior, consistent with innocent travel. Id. at ----, 791 S.E.2d at 493. Therefore, we reversed the decision of the trial court denying Defendant's motion to suppress. Id.
In State v. Bullock , our Supreme Court addressed a similar factual scenario. There, the Supreme Court held an officer may require a driver to exit his vehicle, without unlawfully extending the traffic stop. 370 N.C. 256, 257, 805 S.E.2d 671, 673 (2017) (No. 194A16). In Bullock , after the officer required the driver to exit his vehicle, he frisked the driver for weapons. Id. The Supreme Court held this frisk was lawful, due to concerns of officer safety, and the very brief duration of the frisk. Id. The officer then required the driver to sit in the patrol car, while he ran database checks. Id. The court determined this did not unlawfully extend the stop either. Id. The court then held the officer had reasonable suspicion to thereafter extend the stop and search the defendant's vehicle. Id. The defendant's nervous demeanor, as well as his contradictory and illogical statements provided evidence of drug activity. Id. Additionally, he possessed a large amount of cash and multiple cell phones, and he drove a rental car registered in another person's name. Id. The court determined these observations provided reasonable suspicion of criminal activity, allowing the officer to lawfully extend the traffic stop and conduct a dog sniff. Id.
In reconsideration of our decision, we are bound by the Supreme Court's holdings in Bullock . Therefore, we must conclude Trooper Lamm's actions of requiring Defendant to exit his car, frisking him, and making him sit in the patrol car while he ran records checks and questioned Defendant, did not unlawfully extend the traffic stop. Yet, this case is distinguishable from Bullock because after Trooper Lamm returned Defendant's paperwork and issued the warning ticket, Defendant remained unlawfully seized in the patrol car.
*530 Ordinarily, "an initial traffic stop concludes and the encounter becomes consensual only after an officer returns the detainee's driver's license and registration." State v. Jackson , 199 N.C. App. 236, 243, 681 S.E.2d 492, 497 (2009) ; see also State v. Kincaid , 147 N.C. App. 94, 100, 555 S.E.2d 294, 299 (2001) (stating "[a] reasonable person, under the circumstances, would have felt free to leave when the documents were returned. Therefore, the first seizure concluded when [the officer] returned the documents to defendant."). Yet, the governing inquiry is whether under the totality of the circumstances a reasonable person in the detainee's position "would have believed that he was not free to leave." United States v. Mendenhall , 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980).
Here, a reasonable person in Defendant's position would not believe he was permitted to leave. When Trooper Lamm returned Defendant's paperwork, Defendant was sitting in the patrol car. Trooper Lamm continued to question Defendant as he sat in the patrol car. When the trooper left the patrol car to seek Peart's consent to search the rental car, he told Defendant to "sit tight." At this point, a second trooper was present on the scene, and stood directly beside the passenger door of Trooper Lamm's vehicle where Defendant sat. Moreover, at trial Trooper Lamm admitted at this point Defendant was not allowed to leave the patrol car.
A reasonable person in Defendant's position would not feel free to leave when one trooper told him to stay in the patrol car, and another trooper was positioned outside the vehicle door. Therefore, even after Trooper Lamm returned Defendant's paperwork, Defendant remained seized. To detain a driver by prolonging the traffic stop, an officer must have "reasonable articulable suspicion that illegal activity is afoot." State v. Williams , 366 N.C. 110, 116, 726 S.E.2d 161, 166-67 (2012).
As we concluded in our first opinion, Trooper Lamm did not have reasonable suspicion of criminal activity to justify prolonging the traffic stop. The facts suggest Defendant appeared nervous, Peart held a dog in her lap, dog food was scattered across the *250 floorboard of the vehicle, the car contained air fresheners, trash, and energy drinks-all of which constitute legal activity consistent with lawful travel. While Trooper Lamm initially had suspicions concerning the rental car agreement, the rental company confirmed everything was fine.
These facts are distinguishable from Bullock in which the officer observed the defendant "speeding, following a truck too closely, and weaving briefly over the white line marking the edge of the road."
*531 Bullock at 258, 805 S.E.2d at 674. Then the defendant's hand trembled as he handed over his license. Id. Additionally, the defendant was not the authorized driver on his rental agreement, he had two cell phones, and a substantial amount of cash on his person. Id. He failed to maintain eye contact, and made several contradictory, illogical statements. Id.
We therefore conclude, after reconsideration of our prior opinion in light of Bullock , the trial court erred in denying Defendant's motion to suppress because after the lawful duration of the traffic stop concluded Trooper Lamm unlawfully detained Defendant without reasonable suspicion of criminal activity.
III. Conclusion
For the foregoing reasons, we reverse the trial court's order.
REVERSE.
Chief Judge McGEE concurs.
Judge DILLON dissents in a separate opinion.