HUNTER, JR., Robert N., Judge.
*554 David Michael Reed ("Defendant") filed a motion to suppress evidence found during a traffic stop. On 14 July 2015, Judge Gale Adams entered an order denying Defendant's motion to suppress. On 21 July 2015, Defendant pled guilty, pursuant to a written agreement, to trafficking more than 200 grams but less than 400 grams of cocaine by transportation, and trafficking more than 200 grams but less than 400 grams of cocaine by possession. In exchange for his guilty plea, the State agreed to dismiss charges against his co-defendant, consolidate his two trafficking charges for judgment, and stipulate to an active sentence of 70 to 93 months imprisonment with a $100,000.00 fine. The trial court accepted the plea agreement and sentenced Defendant to 70 to 93 months imprisonment and imposed a $100,000.00 fine and $3,494.50 in court costs. Defendant timely entered his notice of appeal and contends the trial *555 court committed error in denying his motion to suppress. We agree and reverse the trial court.
I. Factual and Procedural Background
At 8:18 a.m. on 9 September 2014, Defendant drove a rented Nissan Altima faster than the posted 65 mph speed limit on Interstate 95 ("I-95") in Johnston County, North Carolina. His fiancée, Usha Peart, rode in the front passenger seat and held a female pit bull in her lap. Trooper John W. Lamm, of the North Carolina State Highway Patrol, was parked in the median of I-95. Trooper Lamm used his radar to determine Defendant was traveling 78 mph, and performed a traffic stop for Defendant's speeding infraction. Trooper Lamm's patrol car had a camera that faced forwards towards the hood of the vehicle, and recorded audio inside and outside of the patrol car.
Defendant pulled over on the right shoulder of I-95, Trooper Lamm pulled behind him, and Trooper Lamm approached the passenger side of the Nissan. Trooper Lamm saw energy drinks, trash, air fresheners, and dog food scattered on the floor of the vehicle. He asked if the dog in Peart's lap was friendly and Defendant and Peart said that the dog was friendly.
Trooper Lamm stuck his arm inside the vehicle to pet the dog and asked Defendant for his driver's license and the rental agreement. Defendant gave Trooper Lamm his New York driver's license, a registration card, and an Enterprise rental car agreement. The rental agreement listed Peart as the renter and Defendant as an authorized driver. Trooper Lamm told Defendant "come *489 on back here with me" motioning towards his patrol car.
Defendant exited the Nissan and Trooper Lamm asked if he had any guns or knives on his person. Defendant asked Trooper Lamm why the frisk was necessary, and Trooper Lamm replied, "I'm just going to pat you down for weapons because you're going to have a seat with me in the car." Trooper Lamm found a pocket knife, said it was "no big deal," and put it on the hood of the Nissan
Trooper Lamm opened the passenger door of his patrol car. His K-9 was in the back seat of the patrol car at that time. Defendant sat in the front passenger seat with the door open and one leg outside of the car. Trooper Lamm told Defendant to close the door. Defendant hesitated and said he was "scared" to close the door; Lamm replied, "Shut the door. I'm not asking you, I'm telling you to shut the door. I mean you're not trapped, the door [is] unlocked. Last time I checked we were the *556 good guys." Defendant said, "I'm not saying you're not," and Trooper Lamm said, "You don't know me, don't judge me." Defendant said he was stopped before in North Carolina, but he was never taken to the front passenger seat of a patrol car during a stop. Following Trooper Lamm's orders, Defendant closed the front passenger door.
Trooper Lamm ran Defendant's New York license through record checks on his mobile computer. While doing so, Trooper Lamm asked Defendant about New York, and "where are y'all heading to?" Defendant said he was visiting family in Fayetteville, North Carolina. Trooper Lamm noted the rental agreement restricted travel to New York, New Jersey, and Connecticut, but told Defendant the matter could likely be resolved with a phone call to the rental company.
Then, Trooper Lamm asked Defendant about his criminal history. Defendant admitted he was arrested for robbery in the past, when he was in the military. Trooper Lamm asked Defendant about his living arrangements with Peart, and whether he or Peart owned the dog in the Nissan. Trooper Lamm noticed the rental agreement was drafted for a Kia Rio not a Nissan Altima. Trooper Lamm exited the patrol car to ask Peart for the correct rental agreement, and told Defendant to "sit tight."
Trooper Lamm approached the front passenger side of the Nissan Altima and asked Peart for the correct rental agreement. He asked about her travel plans with Defendant and the nature of their trip. She said they were visiting family in Fayetteville but might also travel to Tennessee or Georgia. She explained the first rental car they had, the Kia Rio, was struck by another car and the rental company gave them the Nissan Altima as a replacement. She could not find the rental agreement for the Nissan Altima and continued to look for it. Trooper Lamm told Peart he was going to issue Defendant a speeding ticket and the two would "be on [their] way."
Trooper Lamm returned to the patrol car, explained Peart could not locate the correct rental agreement, and continued to question Defendant about the purpose of the trip to Fayetteville. Then, Trooper Lamm called the rental company and the rental company confirmed everything was fine with the Nissan Altima rental, but informed Trooper Lamm that Peart still needed to call the company to correct the restricted travel condition concerning use of the car in New York, New Jersey, and Connecticut. After the call, Trooper Lamm told Defendant that his driver's license was okay and he was going to receive a warning ticket for speeding. Trooper Lamm issued a warning ticket and asked Defendant if he had any questions.
*557 Then, Trooper Lamm told Defendant he was "completely done with the traffic stop," but wanted to ask Defendant additional questions. Defendant did not make an audible response, but at the suppressing hearing, Trooper Lamm testified Defendant nodded his head. Trooper Lamm did not tell Defendant he was free to leave.
Trooper Lamm asked Defendant if he was carrying a number of controlled substances, firearms, or illegal cigarettes in the Nissan Altima. Defendant responded, "No liquor, no nothing, you can break the car down." Trooper Lamm continued questioning Defendant and said, "I want to search your car, is that *490 okay with you?" Defendant hesitated, mumbled, and told Trooper Lamm to ask Peart. Defendant stated, "I'm just saying, I've got to go to the bathroom, I want to smoke a cigarette, we're real close to getting to the hotel so that we can see our family, like, I don't, I don't see a reason why." Trooper Lamm responded, "[W]ell let me go talk to her then, sit tight," and walked to the front passenger side of the Nissan Altima. By this time, two additional officers were present at the scene.
Trooper Lamm told Peart everything was fine with the rental agreement and asked her the same series of questions he asked Defendant, whether the two were carrying controlled substances, firearms, or illegal cigarettes. Trooper Lamm asked Peart if he could search the car. Peart hesitated, expressed confusion, and stated, "No. There's nothing in my car, I mean...." Trooper Lamm continued to ask for consent, Peart acquiesced and agreed to sign a written consent form. Trooper Lamm searched the Nissan Altima and found cocaine under the back passenger seat.
II. Standard of Review
Our review of a trial court's denial of a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." State v. Cooke , 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). "The trial court's conclusions of law ... are fully reviewable on appeal." State v. Hughes , 353 N.C. 200, 208, 539 S.E.2d 625, 631 (2000).
III. Analysis
Defendant contends the trial court made findings of fact that are not supported by competent evidence because his "initial investigatory detention was not properly tailored to address a speeding violation."
*558 Further, he contends Trooper Lamm seized him without consent or reasonable suspicion of criminal activity when Trooper Lamm told him to "sit tight" in the patrol car. Defendant contends Trooper Lamm unlawfully seized items from the car during the search, and these items are fruit of the poisonous tree that must be suppressed. After carefully reviewing the record and video footage of the traffic stop, we agree.
On appeal, Defendant challenges the following findings of fact and conclusion of law:
FINDINGS OF FACT
11. That the Defendant complied with Trooper Lamm's request[1] to accompany him back to the patrol vehicle where Trooper Lamm told the Defendant, while the Defendant was still outside the vehicle, that he was stopped for speeding, which the Defendant acknowledged stating that he "was running about 84"....
21. That while Ms. Peart looked for the current rental agreement, which was never found, Trooper Lamm engaged her in casual conversation and learned from her that she was unsure of their travel plans, but believed they were visiting family in "Fayetteville or maybe Tennessee or Georgia...."
26. That after asking the Defendant if he could search his car, the [D]efendant expressed reluctance before directing Trooper Lamm to ask Ms. Peart since she was the lessee of the vehicle. At which time, Trooper Lamm left the patrol car, asked the Defendant to sit tight, and went to ask Ms. Peart....
CONCLUSIONS OF LAW
2. That Trooper Lamm was at all times casual and conversational in his words and manner.
"[T]he tolerable duration of police inquires in the traffic-stop context is determined by the seizure's 'mission'-to address the traffic violation that warranted the stop, and attend to related safety concerns." State v. Bedient , --- N.C.App. ----, 786 S.E.2d 319, 322 (2016) (quoting *491 Rodriguez v. United States , --- U.S. ----, 135 S.Ct. 1609, 1614, 191 L.Ed.2d 492 (2015) *559 (internal citations omitted)). In addition to deciding whether to issue a traffic ticket, a law enforcement officer's "mission" includes " 'ordinary inquires incident to the traffic stop.' " Bedient , --- N.C.App. at ----, 786 S.E.2d at 322 (quoting Rodriguez , --- U.S. ----, 135 S.Ct. at 1615 ). This inquiry typically includes checking the driver's license, determining if the driver has any outstanding warrants, inspecting the vehicle's registration and proof of insurance, or a rental agreement for a rental car, which is the equivalent of inspecting a vehicle's registration and proof of insurance. See Bedient , --- N.C.App. at ----, ----, 786 S.E.2d at 322-23 (quoting Rodriguez , --- U.S. ----, 135 S.Ct. at 1615 ); See also State v. Bullock , --- N.C.App. ----, 785 S.E.2d 746, 751 (2016), writ of supersedeas allowed , --- N.C. ----, 786 S.E.2d 927 (2016).
The trial court held its suppression hearing 1 June 2015 and issued an order denying Defendant's motion to suppress on 10 July 2015. If the trial court had the benefit of this Court's guidance in Bullock , --- N.C.App. ----, 785 S.E.2d 746, it may have ruled in Defendant's favor.
In Bullock , this Court examined a fact pattern that is nearly identical to the case sub judice and applied the principles of Rodriguez , --- U.S. ----, 135 S.Ct. 1609. In Bullock , the defendant sped and followed another vehicle too closely on the highway. Bullock , --- N.C.App. at ----, 785 S.E.2d at 747-48. When the officer pulled Bullock over, he asked for Bullock's license and rental agreement. Id. , --- N.C.App. at ----, 785 S.E.2d at 748. The rental agreement did not list Bullock's name, though it appeared he wrote his name on the form below the renter's signature. Id. The officer saw two cell phones in the car and noticed Bullock's hands were "trembling a little." Id. The officer asked Bullock where he was traveling. Id. Bullock said he was driving to meet a girl and missed his exit on the highway. Id. The officer "asked [Bullock] to step back to his patrol car while he ran [Bullock's] driver's license." Id. The officer "shook hands with [Bullock] and told him that he would give him a warning for the traffic violation." Id. The officer "then asked if he could briefly search [Bullock] for weapons before he got into his patrol car." Id. Bullock "agreed and lifted his arms up in the air...." Id. Bullock sat in the front seat of the patrol car as the officer ran his driver's license through a mobile computer. Id. The officer's K-9 was in the back seat. Id. While the officer and Bullock sat in the front seats, the officer questioned Bullock. Id. The officer thought Bullock "looked nervous while he was questioning him ..." and saw he was " 'breathing in and out in his stomach' and not making much eye contact." Id. The officer attributed this nervousness "to something other than general anxiety from a routine traffic stop" because he already told Bullock he was going to *560 issue a warning ticket. Id. , --- N.C.App. at ----, 785 S.E.2d at 751. The officer asked Bullock "if there were any weapons or drugs in the car and if he could search the vehicle." Id. , --- N.C.App. at ----, 785 S.E.2d at 748. Bullock consented to the search except for his personal belongings, which included a bag, some clothes, and condoms. Id. The officer called for a backup officer and explained he could not search without another officer present. Id. While they waited approximately ten minutes for a backup officer to arrive, Bullock asked "what would happen if he did not consent to a search of the car," and the officer stated "he would then deploy his K-9 dog to search the car." Id. "At that time, [Bullock] and [the officer] spoke some more about the girl [Bullock] was going to see and other matters unrelated to the traffic stop." Id. The backup officer arrived, searched the car, and found 100 bindles of heroin. Id. , --- N.C.App. at ----, 785 S.E.2d at 749.
The Bullock Court applied the United States Supreme Court's guidance in Rodriguez and held the officer could check Bullock's license and rental agreement, but he "was not allowed to 'do so in a way that prolonged the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.' " Id. , --- N.C.App. at ----, 785 S.E.2d at 751 (quoting Rodriguez , --- U.S. ----, 135 S.Ct. at 1615 ). This Court held, "[the officer] completed the mission of the traffic stop when he told [Bullock] that he was giving [Bullock] a warning for the *492 traffic violations as they were standing at the rear of [Bullock's] car." Id.
Here, Trooper Lamm's authority to seize Defendant for the speeding infraction ended "when tasks tied to the traffic infraction [were]-or reasonably should have been -completed." Rodriguez , --- U.S. ----, 135 S.Ct. at 1614 (emphasis added) (citation omitted). At the very latest, this occurred when Trooper Lamm told Defendant he was going to issue a warning ticket and gave him a hard copy of the warning ticket. See Bullock , --- N.C.App. at ----, 785 S.E.2d at 751. Beyond this identifiable point in time, this Court notes an officer may not delay telling a driver they are going to receive a ticket (or warning ticket), withhold writing or providing a written copy of the ticket (or warning ticket), withhold the driver's license, car registration, rental agreement, or other pertinent documents, in such a way that prolongs " 'the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.' " Id. (quoting Rodriguez , --- U.S. ----, 135 S.Ct. at 1615 ).
Prior to Rodriguez , it was well settled that an officer may ask a driver to exit a vehicle during a traffic stop. See State v. McRae , 154 N.C.App. 624, 629, 573 S.E.2d 214, 218 (2002) (citations omitted). Historically, the de minimis intrusion of asking a driver to exit a vehicle was outweighed *561 by "the government's 'legitimate and weighty' interest in officer safety...." Rodriguez , --- U.S. ----, 135 S.Ct. at 1615 (quoting Pennsylvania v. Mimms , 434 U.S. 106, 110-11, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam)). However, "under Rodriguez , even a de minimis extension is too long if it prolongs the stop beyond the time necessary to complete the mission." Bullock , --- N.C.App. at ----, 785 S.E.2d at 752. Therefore, an officer may offend the Fourth Amendment if he unlawfully extends a traffic stop by asking a driver to step out of a vehicle. See Id. The same is true of an officer who unlawfully extends a traffic stop by asking a driver to sit in his patrol car, thereby creating the need for a weapons pat down.[2] It is also possible for an officer to unlawfully extend a traffic stop by telling a driver to close the patrol car's front passenger door, while the officer questions the driver about matters unrelated to the traffic stop. Further, this Court notes officer safety is put at risk an increased number of times when an officer adds additional steps to delay the traffic stop, such as ordering the driver to step out of the vehicle, patting the driver down, having the driver sit in the patrol car, and sitting next to the driver to ask them questions and observe their demeanor.
To detain a driver beyond a traffic stop, an officer must have "reasonable articulable suspicion that illegal activity is afoot." State v. Williams , 366 N.C. 110, 116, 726 S.E.2d 161, 166-67 (2012) (citing Florida v. Royer , 460 U.S. 491, 497-98, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) ) (citation omitted). An officer is "required to have reasonable suspicion before asking [a] defendant to go to his patrol vehicle to be questioned." Bullock , --- N.C.App. at ----, 785 S.E.2d at 753. During a lawful traffic stop, an officer "may conduct a pat down search, for the purpose of determining whether the person is carrying a weapon, when the officer is justified in believing that the individual is armed and presently dangerous ." State v. Sanders , 112 N.C.App. 477, 480, 435 S.E.2d 842, 844 (1993) (citing Terry v. Ohio , 392 U.S. 1, 24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ; Minnesota v. Dickerson , 508 U.S. 366, 373, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) ) (emphasis added).
Here, the trial court found Trooper Lamm had "sufficient reasonable suspicion of criminal activity to continue the traffic stop beyond the speeding enforcement action" for the following reasons:
a. Defendant was overly nervous for a traffic stop for speeding.
*562 b. Defendant would not close the patrol car door until ordered to do so, stating that *493 he was "scared to do that" and had one leg out of the door.
c. Defendant gave the Trooper a rental agreement for a different car than he was operating and that car was paid for in cash.
d. Defendant was operating the car outside of the approved area for travel, New York, New Jersey, and Connecticut.
e. He noted the presence of numerous air fresheners in the vehicle.
f. The vehicle had a lived in look showing hard travel, such as, coffee, energy drinks, and trash.
g. The presence of a female dog in the car and dog food scattered throughout the car.
h. The driver and passenger provided inconsistent travel plans.
The trial court's findings do not support its conclusion that Trooper Lamm had reasonable suspicion of criminal activity to extend the traffic stop and conduct a search after the traffic stop concluded. The various legal behaviors in the trial court's findings do not amount to a "reasonable articulable suspicion that illegal activity is afoot." Williams , 366 N.C. at 116, 726 S.E.2d at 166-67 (citing Royer , 460 U.S. at 497-98, 103 S.Ct. 1319 ) (citation omitted). "In order to preserve an individual's Fourth Amendment rights, it is of the utmost importance that we recognize that the presence of [a suspicious but legal behavior] is not, by itself, proof of any illegal conduct and is often quite consistent with innocent travel." State v. Fields , 195 N.C.App. 740, 745, 673 S.E.2d 765, 768 (2009) (citing United States v. Sokolow , 490 U.S. 1, 9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) ). Reasonable suspicion may arise from "wholly lawful conduct." Reid v. Georgia , 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890, (1980) (citing Terry , 392 U.S. at 27-28, 88 S.Ct. 1868 ). However, " 'the relevant inquiry is ... the degree of suspicion that attaches to particular types of noncriminal acts.' " Sokolow , 490 U.S. at 10, 109 S.Ct. 1581 (quoting Illinois v. Gates , 462 U.S. 213, 243-44 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ).
Here, Defendant's nervousness is "an appropriate factor to consider," but it must be examined "in light of the totality of the circumstances" because "many people do become nervous when [they are] stopped by an officer...."
*563 State v. McClendon , 350 N.C. 630, 638, 517 S.E.2d 128, 134 (1999) (citations omitted). The degree of suspicion attached to Defendant's possession of a female dog, dog food, coffee, energy drinks, trash, and air fresheners is minimal, as it is consistent with innocent travel.
Most importantly, the trial court's findings are based upon facts that were discovered after the "tolerable duration" of the speeding stop expired, namely Defendant's nervousness and his fear about closing the front passenger door of the patrol car. See Bedient , --- N.C.App. at ----, 786 S.E.2d at 322 (quoting Rodriguez , --- U.S. ----, 135 S.Ct. at 1614 ). Rodriguez clearly changes the law and traffic stop procedures that existed prior to its issuance on 21 April 2015. To affirm the trial court, as the dissent suggests, is to ignore the United States Supreme Court's direction in Rodriguez , --- U.S. ----, 135 S.Ct. 1609.
IV. Conclusion
For the foregoing reasons, we reverse the trial court.
REVERSED.
Chief Judge McGEE concurs.
Judge DILLON dissents in a separate opinion.

Defendant contends the trial court's "determination of [Trooper] Lamm's statement to be a 'request' rather than a command or order is actually a conclusion of law ... because it requires the exercise of judgment."

"By requiring defendant to submit to a pat-down search and questioning in the patrol car unrelated to the purpose of the traffic stop, the officer prolonged the traffic stop beyond the time necessary to complete the stop's mission and the routine checks authorized by Rodriguez ." Bullock , --- N.C.App. at ----, 785 S.E.2d at 753 (citing State v. Castillo , --- N.C.App. ----, 787 S.E.2d 48 (2016) ).