McGEE, Chief Judge.
 

 *651
 
 Leslie Junior Cox ("Defendant") appeals from an order denying his motion to suppress evidence recovered during a traffic stop from a vehicle in which Defendant was a passenger. For the reasons discussed below, we affirm.
 

 I.
 
 Factual and Procedural Background
 

 First Sergeant Clay Bryson ("Sergeant Bryson") and Deputy Sheriff Josh Stewart ("Deputy Stewart") of the Macon County Sheriff's Department ("MCSD") were patrolling U.S. Route 441 in separate patrol cars in Macon County, North Carolina, on 10 December 2015. Sergeant Bryson had been employed by the MCSD for over sixteen years, had extensive training in the area of drug
 
 *55
 
 interdiction, and had investigated more than one hundred drug cases for the MCSD. According to the trial court's unchallenged findings, U.S. Route 441 is a major thoroughfare for traffic from Atlanta, and Atlanta is "a major source of controlled substances for western North Carolina." Sergeant Bryson testified there was "a lot of drug activity on [U.S. Route] 441." While on patrol on 10 December 2015, Sergeant Bryson had with him a police dog trained to detect controlled substances.
 

 Sergeant Bryson was parked in his patrol car on the east side of U.S. Route 441, perpendicular to the road, when he noticed a gold Pontiac ("the vehicle") traveling northbound around 3:00 p.m. Sergeant Bryson testified that, as the vehicle approached, he "noticed the female driver ... was slumped back and over toward the center console [and] the male passenger ... [who was wearing] ... a cowboy type of hat[,] ... tilted his head slightly, almost to block his face." Sergeant Bryson testified this behavior by the driver, later identified as Melanie Pursley ("Pursley"), and the passenger, later identified as Defendant, suggested "nervousness" and "aroused [Sergeant Bryson's] suspicion somewhat [based on] some of the [drug interdiction] training [he had] been through." Sergeant Bryson pulled his patrol car onto the road and into the far left lane, behind the vehicle. When Pursley did not voluntarily switch lanes, Sergeant Bryson moved over into the right-hand lane and pulled up alongside the vehicle. Sergeant Bryson testified that, as he pulled up
 
 *652
 
 beside the vehicle, Pursley "swerved over into [Sergeant Bryson's] lane with the two right[-]side tires of [Pursley's] vehicle crossing the dotted white line in the center of the roadway into [Sergeant Bryson's] lane." This caused Sergeant Bryson to pull his patrol car to the right "over the fog line in order to keep from having a [ ] collision with the vehicle and [to] abruptly hit[ ] [his] brakes." After hitting his brakes, Sergeant Bryson pulled back into the passing lane, behind the vehicle. Using a radar device, Sergeant Bryson clocked the vehicle's speed at sixty-two miles per hour in a fifty-five mile per hour speed limit zone. Sergeant Bryson initiated a traffic stop for Pursley's unsafe movement and the speeding violation, and Pursley pulled off the road into a vacant parking lot.
 

 Sergeant Bryson approached the driver's side of the vehicle and asked Pursley for her driver's license and vehicle registration. Pursley produced a registration card and began "fumbling all through the vehicle ... searching for a driver's license." Sergeant Bryson testified that, as Pursley was searching for her license, he "was watching her behavior" and "note[d] a lot of [ ] nervousness[.]" Pursley's "hands were shaking" when she handed Sergeant Bryson her registration card, and he could "see her heartbeat[.]" Pursley eventually stopped searching for her driver's license and told Sergeant Bryson she believed she had left it at a gas station in Georgia.
 

 Because Pursley had no driver's license or other form of personal identification, Sergeant Bryson asked her to exit the vehicle. While standing behind the vehicle, Sergeant Bryson "engaged [Pursley] in general conversation[,] ... ask[ing] ... where [she was] coming from, [and] where [she was] going[.]" Pursley gave Defendant's name and indicated Defendant was her boyfriend. She stated they were traveling from Georgia, "headed to Kentucky ... [for Pursley] to meet [Defendant's] parents for the first time." Pursley indicated that was "the reason for her nervousness[.]" Sergeant Bryson wrote Pursley's name and date of birth on the back of her registration card.
 

 Sergeant Bryson asked Pursley "if [Defendant] had an ID on him because [Pursley did] not ... and asked if [he] could ... speak to [Defendant]." According to Sergeant Bryson, Pursley responded, "of course." Sergeant Bryson approached the passenger side of the vehicle and tapped on the window "to get [Defendant] to roll it down." Sergeant Bryson testified:
 

 I asked [Defendant] just a couple of general questions after asking for his ID. He [told] me [he and Pursley were] headed to his camper on Big Cove in Cherokee[.] [I] asked
 
 *653
 
 him if he was going to do any gambling over there, just ask[ed] him some general questions. He said they were going over there to work on his camper for the
 
 *56
 
 week. ... As I first walked up to the vehicle-I've been working dope for an extended period of time now. When I walked up to the vehicle I noticed [ ] [Defendant] had a sore, [an] open sore on the side of his face ... [that] looked to me [like] that of a meth[amphetamine ] sore.
 

 Sergeant Bryson indicated one of his purposes in speaking with Defendant was to see if Defendant could "vouch" for Pursley. According to Sergeant Bryson, when asked to verify Pursley's name, Defendant replied: "I guess that's her name." Sergeant Bryson testified that when, at the end of their initial conversation, he again asked Defendant for Pursley's name, Defendant stated "he [did not] remember." Sergeant Bryson testified he "didn't see a great deal of nervousness with [Defendant]."
 

 Sergeant Bryson returned to his patrol car to enter Pursley's name and date of birth into his mobile data terminal. Sergeant Bryson testified it took longer to run a data search using a name and date of birth rather than a driver's license number. Sergeant Bryson also testified he had to search "in the correct [S]tate that [Pursley] was out of, Georgia[,]" and that "[a] lot of times Georgia is slow to respond and ... I have no control over that." The search revealed Pursley's driver's license expired the previous day. Sergeant Bryson prepared a written warning citation. He testified that an out-of-state citation takes longer to prepare because the information must be entered manually rather than by automatically accessing a database of the North Carolina DMV.
 

 While preparing Pursley's warning citation, Sergeant Bryson asked Deputy Stewart to run Defendant's driver's license "to see if [Defendant's license] was valid [such that Defendant would] be able to drive [Pursley's vehicle] off from that location." Sergeant Bryson issued the printed citation to Pursley and returned Defendant's license. Sergeant Bryson testified that, "[i]n the process of getting the [license] back [to Defendant][,] I asked him if there was anything illegal in the vehicle, anything I needed to know of[.]" Defendant responded: "Not that I'm aware of." Sergeant Bryson testified this was a "red flag[,]" based on his drug interdiction training, because it was "a yes or no question." Pursley continued to engage Sergeant Bryson in unsolicited conversation about her expired license. As they continued speaking, Sergeant Bryson asked Pursley whether she was "responsible for everything in the vehicle." Pursley "hesitated and [said], my stuff." Pursley stated Defendant "ha[d] his own stuff." Sergeant Bryson testified this response from Pursley was another "red
 
 *654
 
 flag," because "[a] typical response in a situation like that[ ] [would be][,] I know what's in my vehicle. ... [M]ost people will give you a straight up yes or no answer." Sergeant Bryson asked Pursley "if [the drug-sniffing] dog was going to ... alert on her vehicle, and [Pursley] said, 'I don't reckon.' " This equivocal response from Pursley was "another red flag."
 

 Sergeant Bryson told Pursley he would ask Defendant to exit the vehicle and he would then conduct a dog sniff around the exterior perimeter of the vehicle. Sergeant Bryson testified Pursley's "level of nervousness was elevated" and Pursley continued "engaging [him] in conversation at that point." Pursley indicated Defendant might be in possession of some "personal use" marijuana and that there might be a hunting knife in the vehicle. Sergeant Bryson's dog "[s]howed [ ] indicators that he smelled illegal controlled substances there inside [Pursley's] vehicle." Sergeant Bryson returned the dog to his patrol vehicle and called for assistance to begin searching the vehicle. Inside the vehicle, officers found "[a] large amount of illegal contraband including methamphetamine, some marijuana, [and] some paraphernalia, including baggies, scales, ... [and] pipes."
 

 Defendant was arrested and subsequently indicted on charges of trafficking in methamphetamine by possession, possession of marijuana, possession of drug paraphernalia, trafficking in methamphetamine by transportation, and possession of methamphetamine with intent to manufacture, sell, or deliver. Defendant filed a motion on 23 March 2016 seeking "to suppress the use as evidence of any and all items seized from the vehicle of the co-defendant [ ] Pursley." Defendant contended Sergeant Bryson unlawfully extended
 
 *57
 
 the 10 December 2015 traffic stop without reasonable suspicion of criminal activity by either Pursley or Defendant. The trial court held a hearing on Defendant's motion to suppress on 26 July 2016 and denied the motion by order entered 29 July 2016. A jury convicted Defendant on all charges on 4 November 2016. The trial court consolidated Defendant's convictions for sentencing and sentenced Defendant to two separate terms of 225 to 282 months' imprisonment. Defendant appeals.
 

 II.
 
 Motion to Suppress
 

 Defendant contends the trial court erred by denying his motion to suppress because Sergeant Bryson unlawfully extended an otherwise-completed traffic stop without reasonable suspicion of criminal activity. Following our Supreme Court's recent holding in
 
 State v. Bullock
 
 ,
 
 370 N.C. 256
 
 ,
 
 805 S.E.2d 671
 
 (2017), we disagree.
 

 *655
 
 A.
 
 Standard of Review
 

 "This Court's review of an appeal from the denial of a defendant's motion to suppress is limited to determining 'whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the [trial court's] conclusions of law.' "
 
 State v. Granger
 
 ,
 
 235 N.C. App. 157
 
 , 161,
 
 761 S.E.2d 923
 
 , 926 (2014) (quoting
 
 State v. Biber
 
 ,
 
 365 N.C. 162
 
 , 167-68,
 
 712 S.E.2d 874
 
 , 878 (2011) ). "[W]e examine the evidence ... in the light most favorable to the State[.]"
 
 State v. Hunter
 
 ,
 
 208 N.C. App. 506
 
 , 509,
 
 703 S.E.2d 776
 
 , 779 (2010).
 

 On appeal, "[t]he trial court's findings of fact regarding a motion to suppress are conclusive ... if supported by competent evidence."
 
 State v. Edwards
 
 ,
 
 185 N.C. App. 701
 
 , 702,
 
 649 S.E.2d 646
 
 , 648 (2007). "[U]nchallenged findings of fact are presumed to be supported by competent evidence and [are] binding on appeal."
 
 Cape Fear River Watch v. N.C. Envtl. Mgmt. Comm'n
 
 ,
 
 368 N.C. 92
 
 , 99,
 
 772 S.E.2d 445
 
 , 450 (2015) (citation and quotation marks omitted) (first alteration added). "Our review of a trial court's conclusions of law on a motion to suppress is
 
 de novo
 
 ."
 
 Edwards
 
 ,
 
 185 N.C. App. at 702
 
 ,
 
 649 S.E.2d at 648
 
 (citation omitted). "Under
 
 de novo
 
 review, this Court considers the matter anew and freely substitutes its own judgment for that of the [trial court]."
 
 State v. Ward
 
 ,
 
 226 N.C. App. 386
 
 , 388,
 
 742 S.E.2d 550
 
 , 552 (2013) (citation and internal quotation marks omitted) (alteration in original).
 

 B.
 
 Analysis
 

 According to Defendant, the 10 December 2015 traffic stop concluded when Sergeant Bryson issued the warning citation to Pursley and, at that time, Sergeant Bryson lacked necessary reasonable suspicion to justify extending the stop to conduct the dog sniff that ultimately led to the discovery of contraband inside Pursley's vehicle.
 

 The Fourth Amendment to the United States Constitution secures the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. "A traffic stop is a seizure even though the purpose of the stop is limited and the resulting detention quite brief."
 
 State v. Barnard
 
 ,
 
 362 N.C. 244
 
 , 246,
 
 658 S.E.2d 643
 
 , 645 (2008) (citation and internal quotation marks omitted). During a traffic stop, both the driver
 
 and
 
 any passengers are "seized" within the meaning of the Fourth Amendment, and a passenger "may challenge the constitutionality of the stop[,] ... including any improper prolongation of that investigatory detention."
 
 State v. Hernandez
 
 ,
 
 208 N.C. App. 591
 
 , 597,
 
 704 S.E.2d 55
 
 , 59 (2010) (citations and internal quotation marks omitted). While "it is not unreasonable under the Fourth Amendment ... to detain a passenger when a vehicle
 
 *656
 
 has been stopped due to a traffic violation committed by the driver of the car[,]" this Court has held that "a passenger may not be detained indefinitely. Once the original purpose of the stop has been addressed, there must be grounds which provide a reasonable and articulable suspicion in order to justify further delay."
 
 State v. Brewington
 
 ,
 
 170 N.C. App. 264
 
 , 272,
 
 612 S.E.2d 648
 
 , 653 (2005) (citations and internal quotation marks omitted).
 

 The "tolerable duration" of a routine traffic stop "is determined by the seizure's 'mission,' which is to address the traffic violation that warranted the stop, and attend to related safety concerns."
 

 *58
 

 Rodriguez v. U.S.
 
 , 575 U.S. ----, ----,
 
 135 S.Ct. 1609
 
 , 1614,
 
 191 L.Ed. 2d 492
 
 , ---- (2015) (internal citation omitted). In
 
 Rodriguez
 
 , the United States Supreme Court held that a seizure for a traffic violation "ends when tasks tied to the traffic infraction are-or reasonably should have been-completed[,]" and an otherwise-completed traffic stop may not be prolonged "absent the reasonable suspicion ordinarily demanded to justify detaining an individual."
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1615
 
 , 191 L.Ed. 2d at ---- ;
 
 see also
 

 State v. Downey
 
 , --- N.C. App. ----, ----,
 
 796 S.E.2d 517
 
 , 519 (2017) ("When a law enforcement official initiates a valid traffic stop, ... the officer may not extend the duration of that stop beyond the time necessary to issue the traffic citation unless the officer has reasonable, articulable suspicion of some other crime." (citation omitted) ).
 

 "Traffic stops have been historically reviewed under the investigatory detention framework first articulated [by the United States Supreme Court] in
 
 Terry v. Ohio
 
 ,
 
 392 U.S. 1
 
 , [
 
 88 S.Ct. 1868
 
 ]
 
 20 L.Ed. 2d 889
 
 (1968). Therefore, reasonable suspicion is the necessary standard for traffic stops."
 
 State v. Otto
 
 ,
 
 366 N.C. 134
 
 , 137,
 
 726 S.E.2d 824
 
 , 827 (2012) (citation and quotation marks omitted). "If [an] investigatory seizure is invalid [due to a lack of reasonable suspicion], evidence resulting from the warrantless stop is inadmissible under the exclusionary rule in both our federal and state constitutions."
 
 State v. Fields
 
 ,
 
 195 N.C. App. 740
 
 , 743,
 
 673 S.E.2d 765
 
 , 767 (2009) (citation omitted). "Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence. Only some minimal level of objective justification is required."
 
 State v. Salinas
 
 ,
 
 214 N.C. App. 408
 
 , 409,
 
 715 S.E.2d 262
 
 , 264 (2011) (citation and quotation marks omitted). Our Supreme Court
 

 has determined that the reasonable suspicion standard requires that the stop ... be based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious
 
 *657
 
 officer, guided by his experience and training. Moreover, [a] court must consider "the totality of the circumstances-the whole picture" in determining whether a reasonable suspicion exists.
 

 Id.
 

 at 409-10
 
 ,
 
 715 S.E.2d at 264
 
 (citation and quotation marks omitted) (alterations in original);
 
 see also
 

 State v. Johnson
 
 ,
 
 370 N.C. 32
 
 ,
 
 803 S.E.2d 137
 
 , 139 (2017) ("To determine whether reasonable suspicion exists, courts must look at 'the totality of the circumstances,' as viewed from the standpoint of an
 
 objectively
 
 reasonable police officer[.]" (citations and internal quotation marks omitted) (emphasis added) ).
 

 In the present case, Defendant contends that (1) the traffic stop concluded when Sergeant Bryson gave the warning citation to Pursley,
 
 [1]
 
 and (2) "[a]t that point in the stop, [Sergeant] Bryson could not have formed reasonable suspicion [of criminal activity] from his interactions with Pursley and [Defendant][.]" Defendant has not challenged any of the trial court's findings of fact, and we therefore "accept the findings of fact as true."
 
 State v. Gerard
 
 , --- N.C. App. ----, ----,
 
 790 S.E.2d 592
 
 , 595 (2016). Defendant also does not appear to argue that Sergeant Bryson unlawfully prolonged the traffic stop up to the point of issuing the warning citation to Pursley. Indeed, Defendant states in his brief that the printing of the warning citation was "the end of what had been
 
 a 'necessary and unavoidable' process
 
 ." (emphasis added).
 

 *59
 
 Thus, the only question for our consideration is whether, as Defendant argues, the trial court erroneously concluded Sergeant Bryson observed a sufficient number of "red flags" prior to issuing the warning citation to support a reasonable suspicion of criminal activity and justify further detaining Defendant and Pursley. Applying
 
 Bullock
 
 , as further discussed below, we do not find the trial court's conclusion erroneous.
 

 *658
 
 The trial court stated the following in Conclusion of Law Number Three:
 

 The [c]ourt's findings of fact show that up to the point of the delivery of the citation [to Pursley], the "red flags" that [Sergeant] Bryson [observed] were as follows:
 

 a. [Pursley's and Defendant's] evasiveness [by] hiding their faces as they passed [Sergeant] Bryson;
 

 b. [The fact that Pursley and Defendant were] travelling on a road known to [Sergeant] Bryson as a major route for drug traffic into western North Carolina;
 

 c. The swerving of [Pursley's] car upon the sudden appearance of [Sergeant Bryson's patrol vehicle];
 

 d. Pursley's extreme and continued nervousness;
 

 e. The clear inconsistencies in [Pursley's and Defendant's] descriptions of their travel plans and their relationship;
 

 f. The open sore on [Defendant's] face, which [Sergeant] Bryson believed to be related to [the] use of methamphetamine; [and]
 

 g. Pursley's equivocal answer to [Sergeant Bryson's] question, "Is there anything in the vehicle that I need to know about?"
 

 The court later concluded in Conclusion of Law Number Thirteen that "[g]iven the 'red flags' observed by [Sergeant] Bryson
 
 before
 
 he delivered the warning citation to Pursley, ... based on the totality of [the] circumstances, reasonable suspicion existed to support [Sergeant] Bryson ... in his determination that criminal activity may have been afoot." (emphasis in original). Defendant does not dispute that Sergeant Bryson in fact observed the "red flags" enumerated in Conclusion of Law Number Three. Defendant instead argues that the first six "red flags" relied upon by the trial court involved noncriminal behavior "consistent with innocent travel."
 
 See
 

 Fields
 
 ,
 
 195 N.C. App. at 745
 
 ,
 
 673 S.E.2d at 768
 
 . Defendant further asserts that the final "red flag" identified in Conclusion of Law Number Three-Pursley's equivocal response to Sergeant Bryson's question about the contents of the vehicle-actually occurred
 
 after
 
 Sergeant Bryson issued the citation and returned Pursley's registration.
 

 *659
 
 Defendant cites
 
 State v. Reed
 
 , --- N.C. App. ----,
 
 791 S.E.2d 486
 
 (2016), in which this Court held a law enforcement officer lacked reasonable suspicion of criminal activity to extend a traffic stop after issuing a speeding ticket. In
 
 Reed
 
 , a state trooper pulled the defendant over for speeding and, in the course of the stop, asked the defendant to sit in the trooper's patrol vehicle while he ran checks on the defendant's license and criminal background; asked the defendant questions about his travel plans and criminal history; and separately questioned the defendant's passenger. The trooper "told [the] [d]efendant that his driver's license was okay[,] ... issued a warning ticket [for speeding][,] and asked [the] [d]efendant if he had any questions."
 

 Id.
 

 at ----,
 
 791 S.E.2d at 489
 
 . The trooper then told the defendant "he was completely done with the traffic stop, but [that he] wanted to ask [the] [d]efendant additional questions."
 

 Id.
 

 (internal quotation marks omitted). The trooper's subsequent questioning of the defendant and the passenger led to the discovery of cocaine inside the defendant's vehicle.
 

 This Court held the
 
 Reed
 
 trial court's findings of fact "[did] not support its conclusion that [the trooper] had reasonable suspicion of criminal activity to extend the traffic stop and conduct a search after the traffic stop concluded."
 

 Id.
 

 at ----,
 
 791 S.E.2d at 493
 
 . The factors relied upon by the trial court in that case included that the defendant appeared "overly nervous;" initially refused to sit in the trooper's patrol vehicle with the door closed; and provided a rental car agreement for a different car than the vehicle he was operating.
 

 Id.
 

 at ----,
 
 791 S.E.2d at 492-93
 
 . The trial court further found that the defendant was driving outside the geographic area approved in his rental car agreement;
 

 *60
 
 the trooper observed numerous air fresheners in the defendant's vehicle and other signs of "hard travel;" there was a female dog in the defendant's vehicle and "dog food scattered throughout the car[;]" and the defendant and his passenger "provided inconsistent travel plans."
 

 Id.
 

 at ----,
 
 791 S.E.2d at 493
 
 . This Court concluded that the
 
 Reed
 
 defendant's nervousness, although "an appropriate factor to consider," was insufficient to support reasonable suspicion when considered together with other factors that were "consistent with innocent travel[,]" including the presence of a dog in the vehicle and the defendant's possession of energy drinks, trash, dog food, and air fresheners.
 
 See
 
 id.
 

 ;
 
 but see
 

 State v. Castillo
 
 ,
 
 247 N.C. App. 327
 
 , 337,
 
 787 S.E.2d 48
 
 , 54 (2016) (recognizing that "[f]actors consistent with innocent travel,
 
 when taken together
 
 , can give rise to reasonable suspicion, even though some travelers exhibiting those factors will be innocent." (citation and quotation marks omitted) (emphasis added) ).
 

 *660
 
 Our Supreme Court vacated and remanded this Court's decision in
 
 Reed
 
 for reconsideration in light of its holding in
 
 Bullock
 
 .
 
 [2]
 

 Reed
 
 is therefore unavailing to Defendant, and
 
 Bullock
 
 controls Defendant's appeal. In
 
 Bullock
 
 , our Supreme Court reversed a decision of this Court in which we held a law enforcement officer lacked reasonable articulable suspicion of criminal activity before extending the duration of a traffic stop. The
 
 Bullock
 
 defendant was pulled over for speeding and unsafe movement. In the course of the traffic stop, officers ultimately discovered a large amount of heroin inside the vehicle the defendant was driving. This Court held the police "unlawfully prolonged [the stop] by causing [the] defendant to be subjected to a frisk, sit in the officer's patrol car, and answer questions while the officer searched law enforcement databases for reasons unrelated to the mission of the stop and for reasons exceeding the routine checks authorized by
 
 Rodriguez
 
 ."
 
 State v. Bullock
 
 ,
 
 247 N.C. App. 412
 
 , ----,
 
 785 S.E.2d 746
 
 , 752 (2016).
 

 Our Supreme Court reversed this Court's decision and held the traffic stop at issue in
 
 Bullock
 
 was not unlawfully prolonged under the framework set forth in
 
 Rodriguez
 
 . The Court began its analysis by noting that, under
 
 Rodriguez
 
 , "the duration of a traffic stop must be limited to the length of time that is reasonably necessary to accomplish the mission of the stop, unless reasonable suspicion of another crime arose
 
 before that mission was completed
 
 [.]"
 
 Bullock
 
 , 370 N.C. at ----,
 
 805 S.E.2d at 673
 
 (citations omitted) (emphasis added). It further noted that "[t]he reasonable duration of a traffic stop ... includes more than just the time needed to write a ticket[,]"
 
 e.g.
 
 , time spent conducting " 'ordinary inquiries incident to [the traffic] stop' " and taking certain precautionary safety measures.
 

 Id.
 

 (citation omitted).
 

 The facts in
 
 Bullock
 
 showed that the officer who initiated the traffic stop was an experienced police officer specially trained in drug
 
 *661
 
 interdiction. It was undisputed that the officer had reasonable suspicion to stop the defendant based on multiple traffic violations. After initiating the traffic stop, the officer asked to see the defendant's driver's license and registration. The defendant provided a driver's license, but indicated the vehicle was a rental car. The rental car agreement showed the car had been rented in another person's name, and the defendant "was not listed as an authorized driver on the rental agreement."
 

 Id.
 

 at ----,
 
 805 S.E.2d at 674
 
 . During this initial interaction, the officer observed
 
 *61
 
 multiple cell phones inside the vehicle which, in the officer's experience, was common among "people who transport illegal drugs[.]"
 

 Id.
 

 The defendant told the officer he had recently moved to North Carolina. He also indicated he was going to a specific location, but the officer "knew that [the] defendant was well past his exit if [he] was going [where he said]."
 

 Id.
 

 The officer asked the defendant to exit the vehicle, told the defendant he would receive a warning for the traffic violations, and frisked the defendant. During the frisk, the officer found a large sum of cash in the defendant's pocket. After the frisk, the defendant sat in the officer's patrol car while the officer "[ran the] defendant's information through various law enforcement databases[.]"
 

 Id.
 

 at ----,
 
 805 S.E.2d at 675
 
 .
 

 While sitting in the patrol car, the
 
 Bullock
 
 defendant made certain self-contradictory statements and made inconsistent eye contact with the officer. The database checks revealed the defendant was issued a North Carolina driver's license more than a decade prior and had a criminal history in North Carolina, calling into question the defendant's earlier statement that he had only recently moved to North Carolina. The officer asked for the defendant's permission to search his vehicle. The defendant assented to a search of the vehicle but not certain personal possessions inside it. The officer removed a bag from the trunk of the defendant's vehicle and performed a dog sniff. The dog alerted to the bag, which was found to contain heroin.
 

 Id.
 

 Our Supreme Court held the officer did not unlawfully prolong the stop by frisking the defendant, asking the defendant to sit in the patrol car while running several database checks, or talking to the defendant "up until the moment that all three database checks had been completed."
 

 Id.
 

 at ----,
 
 805 S.E.2d at 677
 
 . The Court then concluded:
 

 The conversation that [the officer] had with [the] defendant while the database checks were running enabled [the officer] to constitutionally extend the traffic stop's duration. The trial court's findings of fact show[ed] that, by the time these database checks were complete, this conversation,
 
 in conjunction with [the officer's]
 

 *662
 

 observations from earlier in the traffic stop
 
 , permitted [the officer] to prolong the stop until he could have a dog sniff performed.
 

 Id.
 

 (emphasis added). The Court noted that the officer "came into the stop with extensive experience investigating drug running, and he knew that [the route the defendant was traveling was] a major drug trafficking corridor."
 

 Id.
 

 "[E]ven before [the] defendant began talking[,]" the officer made several observations that "suggested possible drug-running," including the defendant's nervousness, the presence of multiple cell phones inside the defendant's vehicle, and the fact that the defendant was driving a rental vehicle that had been rented in another person's name.
 

 Id.
 

 "[The] [d]efendant's conversation with [the officer], and other aspects of their interaction, quickly provided more evidence of drug activity[,]" including the defendant's "illogical" statement about his intended destination and the cash found in the defendant's pocket. While speaking to the officer inside the patrol car, the defendant made self-contradictory statements and did not maintain consistent eye contact. The database checks also suggested the defendant had been untruthful about recently moving to North Carolina. Under these circumstances, "the officer legally extended the duration of the traffic stop to allow for the dog sniff."
 

 Id.
 

 at ----,
 
 805 S.E.2d at 678
 
 .
 

 In the present case, we likewise conclude the trial court's findings of fact supported its conclusion that Sergeant Bryson observed a sufficient number of "red flags"
 
 before
 
 issuing the warning citation to Pursley to support a reasonable suspicion of criminal activity and therefore justify extending the stop. Sergeant Bryson had extensive training in drug interdiction, including "the detection of behaviors by individuals that tend to indicate activity related to the use, transportation[,] and other activity [associated] with controlled substances." He had investigated more than one hundred drug cases for the MCSD and knew that U.S. Route 441 was a major thoroughfare for drug trafficking from Atlanta into western North Carolina. When Sergeant Bryson first saw Pursley's vehicle, he observed body language by both Pursley
 
 *62
 
 and Defendant that he considered evasive. Pursley exhibited "extreme and continued nervousness" throughout the ensuing traffic stop and was unable to produce any form of personal identification. Defendant and Pursley gave conflicting accounts of their travel plans and their relationship to each other. During Sergeant Bryson's initial conversation with Defendant-which Defendant has not challenged as improper-Sergeant Bryson observed an open sore on Defendant's face that appeared, based on Sergeant Bryson's professional training and experience, "related to [the]
 
 *663
 
 use of methamphetamine[.]" Background checks further revealed that Pursley was driving with an expired license. Under
 
 Bullock
 
 , considering the totality of the circumstances, we conclude Sergeant Bryson formed reasonable suspicion of criminal activity, before issuing the written warning citation and returning Pursley's vehicle registration, sufficient to justify extending the traffic stop for further investigation.
 
 [3]
 

 See
 

 Downey
 
 , --- N.C. App. at ----,
 
 796 S.E.2d at 521-22
 
 .
 

 III.
 
 Conclusion
 

 Because the trial court's findings of fact supported its conclusion that Sergeant Bryson formed reasonable suspicion of criminal activity before the mission of the 10 December 2015 traffic stop was complete, we affirm the trial court's order denying Defendant's motion to suppress.
 

 AFFIRMED.
 

 Judges STROUD and BERGER concur.
 

 [1]
 

 The trial court similarly determined that "[t]he 'traffic stop' mission was concluded when [Sergeant] Bryson handed the warning citation to Pursley." We note this Court has held that "an initial traffic stop concludes ...
 
 only after an officer returns the detainee's driver's license and registration
 
 ."
 
 State v. Jackson
 
 ,
 
 199 N.C. App. 236
 
 , 243,
 
 681 S.E.2d 492
 
 , 497 (2009) (emphasis added);
 
 see also
 

 State v. Velasquez-Perez
 
 ,
 
 233 N.C. App. 585
 
 , 595,
 
 756 S.E.2d 869
 
 , 876 (2014) (discussing
 
 Jackson
 
 , and holding traffic stop did not conclude when officer handed defendant written warning citation, because officer "had not completed his checks related to the licenses, registration, insurance, travel logs, and invoices of [the defendant's] commercial vehicle."). Thus, contrary to Defendant's argument, the mere issuance of the printed citation to Pursley did not itself conclude the traffic stop. However, the distinction is inapposite in this case, because the trial court's findings indicate Sergeant Bryson returned Pursley's registration at the same time he handed her the printed citation, thus concluding the initial traffic stop.
 

 [2]
 

 On remand, this Court found
 
 Bullock
 
 factually distinguishable and again held that the officer in
 
 Reed
 
 "did not have reasonable suspicion of criminal activity to justify prolonging the traffic stop."
 
 State v. Reed
 
 , --- N.C. App. ----, ----,
 
 810 S.E.2d 245
 
 , 249 (2018) ("
 
 Reed II
 
 "). This Court concluded that, under
 
 Bullock
 
 , the
 
 Reed
 
 officer's "actions of requiring [the] [d]efendant to exit his car, frisking him, and making him sit in the patrol car while he ran records checks and questioned [the] [d]efendant, did not unlawfully extend the traffic stop."
 

 Id.
 

 We further concluded, however, that "after [the officer] returned [the] [d]efendant's paperwork and issued the warning ticket, [the] [d]efendant remained unlawfully seized in the patrol car[,]" and the stop was improperly prolonged based on "legal activity consistent with lawful travel."
 

 Id.
 

 at ----,
 
 810 S.E.2d at 249-50
 
 . The State filed a motion seeking a temporary stay of this Court's decision in
 
 Reed II
 
 , which our Supreme Court allowed by order entered 2 February 2018.
 
 See
 

 State v. Reed
 
 ,
 
 370 N.C. 580
 
 ,
 
 809 S.E.2d 130
 
 (2018). We do not find the present case materially distinguishable from
 
 Bullock
 
 , and this Court's holding in
 
 Reed II
 
 does not alter our analysis.
 

 [3]
 

 We find it unnecessary to address Defendant's argument that one of the seven "red flags" relied upon by the trial court actually occurred after the issuance of Pursley's warning citation. The "red flags" that Defendant concedes did occur before the completion of the traffic stop were sufficient to support a conclusion that reasonable suspicion existed to justify extending the stop.
 
 See
 

 State v. Rayfield
 
 ,
 
 231 N.C. App. 632
 
 , 648,
 
 752 S.E.2d 745
 
 , 757 (2014) (holding that "to the extent the trial court's other findings contain[ed] errors, they [were] not so severe as to undercut the court's conclusion of law that probable cause was present to justify [a] search[ ] ... [i]n light of the other evidence cited by the trial court in support of its conclusion[.]").